TOWNSEND AND TOWNSEND AND CREW LLP
PAUL W. VAPNEK (State Bar No. 36576)
JOHN E. LORD (State Bar No. 216111)
JUDITH M. SCHVIMMER (State Bar No. 230285)
Two Embarcadero Center, 8th Floor
San Francisco, California 94111
Telephone: (415) 576-0200
Facsimile: (415) 576-0300
Email: pwvapnek@townsend.com
        jelord@townsend.com
        jmschvimmer@townsend.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHOLIC CHARITIES CYO, a California non-profit corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>MARY W. GORDON, A California resident; ERIK "WITAKE" OBERG, a California resident; EMILY WOOD ORDWAY, a California resident; PAULA PARDINI, a California resident; and CARITAS CREEK, a California corporation;<br><br>        Defendants. | Case No.  C 07-02658 SI<br><br>**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** |

1.    Paragraph 1 states the Court's basis for jurisdiction and requires no answer.

2.    Paragraph 2 states the Court's basis for jurisdiction and requires no answer.

3.    Paragraph 3 states the Court's basis for jurisdiction and requires no answer.

4.    Paragraph 4 states the Court's basis for jurisdiction and requires no answer.

5.    Paragraph 5 states the Court's basis for venue and requires no answer.

6.    The allegations of paragraph 6 are admitted.

7.    Mary Gordon is a resident of California and this District and is a member of the Board of Caritas Creek, a California corporation.

1        8.      Paula M. Pardini is a resident of California and this District and is a member of the

2  Board of Caritas Creek, a California corporation.

3        9.      Erik "Witake" Oberg is a resident of California and this District and is a Caritas Creek

4  Site Director.

5        10.     Emily W. Ordway is a resident of California and this District and is a Caritas Creek

6  Site Director.

7        11.     Caritas Creek is a California corporation and its agent for service of process is Justin

8  Dobrin.

9        12.     Defendants are without sufficient information or belief as to the veracity of the

10  allegations of paragraph 12 of the complaint, and upon that basis deny them.

11        13.     Defendants are without sufficient information or belief as to the veracity of the

12  allegations of paragraph 13 of the complaint, and upon that basis deny them.

13        14.     Defendants are without sufficient information or belief as to the veracity of the

14  allegations of paragraph 14 of the complaint, and upon that basis deny them.

15        15.     Defendants are without sufficient information or belief as to the veracity of the

16  allegations of paragraph 15 of the complaint, and upon that basis deny them.

17        16.     Defendants admit that Caritas Creek was founded in 1975.  Defendants deny the

18  remaining allegations of paragraph 16 of the complaint.  Caritas Creek was founded to offer a unique

19  environmental education and summer camp program to children from Bay Area Catholic schools (and

20  public & private schools).  The program's mission was, and still is, to help young people discover the

21  connection between all living things, to build bridges between diverse socio-economic and ethnic

22  groups, and to foster in youth a deeper connection to the environment, to self, to the spirit of love, and

23  to community.

24        17.     Defendants deny the allegations of paragraph 17 of the complaint.  Caritas Creek did

25  not approach CYO.  CYO pursued Caritas Creek from 1978 until Caritas Creek agreed to bring the

26  Caritas Creek program to CYO in 1983.  CYO's Associate Director provided the major appeal to

27  Caritas Creek and was supported in his efforts by CYO's General Director.

28        CYO made it clear that they believed that Caritas Creek and CYO were philosophically in

1    sync, and that CYO would benefit from Caritas Creek's use of CYO's Occidental facility, which sat

2    unused during the school year, other than weekend rentals for retreats.  CYO acknowledged that

3    Caritas Creek had a viable EE program and CYO had no experience in this domain.  The benefit to

4    Caritas Creek would be that CYO could provide a more stable financial base.

5        Caritas Creek was reluctant to bring the program under CYO's influence because Caritas Creek

6    was deeply committed to its mission and did not want that mission to be altered in any way.  Caritas

7    Creek drew up  "An Agreement Between Caritas Creek and the Catholic Youth Organization of the

8    San Francisco Archdiocese Concerning An Environmental Education Program", which by its terms

9    were to take effect  September 6, 1983.  A true copy of the Agreement is attached as Exhibit 1.  The

10   Agreement was accompanied by an Open Letter to CYO from Caritas Creek.  A true copy of that

11   Open Letter is attached as Exhibit 2.

12       18.      Defendants admit the allegations of paragraph 18 of the complaint.

13       19.      Defendants deny the allegations of paragraph 19 of the complaint.

14       20.      Defendants admit the allegations of the first sentence of paragraph 20 of the complaint.

15   Defendants are without sufficient information or belief as to the veracity of the allegations of the

16   second sentence of paragraph 20, and upon that basis deny them.  Defendants aver that the CYO

17   employees for the Caritas Creek and summer camp programs were recruited and trained by the

18   original Caritas Creek director and the original Caritas Creek staff members without any supervision,

19   direction or control by Plaintiff's management.

20       21.      Defendants are without sufficient information or belief as to the veracity of the

21   allegations of paragraph 21 of the complaint, and upon that basis deny them.  Defendants note that all

22   the listed expenditures were for physical improvements to the facilities that were also used by others

23   who paid rental fees to the Plaintiff.  Plaintiff's management refused to follow the requests of

24   Defendants that the construction be more environmentally friendly and the cabins be more rustic in

25   keeping with the principles of the Caritas Creek programs.  The cost of the work would likely have

26   been lower as well, had Defendants' requests been followed.

27       22.      Defendants deny the allegations of paragraph 22 of the complaint.  The success of the

28   Caritas Creek program was the result of dedication and hard work of its original director and of the

1  dedicated staff she assembled, hired, and trained.  It is this group, and its successors, not Plaintiff that

2  the public recognizes as Caritas Creek.

3      23.    Defendants deny the allegations of paragraph 23 of the complaint.  Caritas Creek has

4  become well-known in the Bay Area and elsewhere only because of the work of Defendants and their

5  predecessors who operated the programs at CYO facilities without any supervision, direction, or

6  control by Plaintiff.

7      24.    Defendants admit Exhibits A & B are attached to the complaint; Defendants deny the

8  remaining allegations of paragraph 24.

9      25.    Defendants deny the allegations of paragraph 25 of the complaint.  The question of

10  ownership never arose from 1985 to January, 2007.  Defendants understood that the name and logo of

11  Caritas Creek was merely licensed to Plaintiff as reflected in the Agreement, Exhibit 1.  Defendants

12  are informed and believe that Plaintiff's representatives told the former staff of the Caritas Creek

13  programs in January, 2007 that Plaintiff was not interested in the name Caritas Creek for the programs

14  that were to be substantially changed from those that had become known since 1975.

15      26.    Defendants deny the allegations of paragraph 26 of the complaint.

16      27.    Defendants deny the allegations of paragraph 27 of the complaint.

17      28.    Defendants deny the allegations of paragraph 28 of the complaint.  Plaintiff's

18  management never exercised supervision, direction or control of Defendants in their offering or

19  providing of educational services by the program staff who ran the program at Plaintiff's facilities.

20  When the newest program director of Plaintiff tried to impose major changes in the programs and staff

21  resisted, the entire staff, some 31 or 32 persons were summarily fired and those living on the premises

22  were evicted.

23      29.    Defendants deny the allegations of paragraph 29 of the complaint.

24      30.    Defendants deny the allegations of paragraph 30 of the complaint. Before the complaint

25  was filed, Plaintiff's counsel were made aware of and given a copy of the Agreement, Exhibit 1, by

26  which the Caritas Creek name and logo were licensed to Plaintiff.

27      31.    Defendants deny the allegations of paragraph 31 of the complaint.

28      32.    Defendants are without sufficient information or belief as to the veracity of the

1    allegations of paragraph 32 of the complaint, and upon that basis deny them.  Disagreements between

2    Plaintiff and Defendants began as early as 1993, primarily having to do with the fairness of working

3    schedules, fairness in salary increases, and relating to the power of the Caritas Creek Director to run

4    the program with minimal interference from management of Plaintiff.  Defendant Paula Pardini was

5    forced to resign in 2000 because of disagreements with Plaintiff's management over their failure to

6    properly support the Caritas Creek programs.  The conflicts became more acute starting early in 2005

7    when Dr. Glenn Motola became Director of Programs and Services, and culminated in January 2007

8    with the mass firing of the entire staff of the Caritas Creek program and its director.  The principal

9    consultant used by Plaintiff was a risk management firm; 15% of its report concerns risk management

10   issues, the balance concerns program and curriculum content for which Defendants believe the

11   consultant was and is unqualified.  Its report appears to reflect Dr. Motola's agenda for major changes

12   in the Caritas Creek programs.

13        33.    Defendants are without sufficient information or belief as to the veracity of the

14   allegations of paragraph 33 of the complaint, and upon that basis deny them.  In January 2007, the

15   Caritas Creek staff did not refuse to implement the proposed changes.  Staff agreed in a January 17,

16   2007 meeting to implement the proposed changes so long as there were no curriculum cuts.  Despite

17   this, on January 19, 2007 staff was advised of summary cancellation of the Caritas Creek programs

18   and the mass firings then took place.

19        34.    Defendants are without sufficient information or belief as to the veracity of the

20   allegations of paragraph 34 of the complaint, and upon that basis deny them.  The letter speaks for

21   itself and is seriously misleading:  the "unanticipated staffing shortage" resulted from the mass firing

22   of the Caritas Creek program staff; and the "retreat programs" allegedly to be offered in the fall are not

23   the Caritas Creek Environmental Education programs previously offered, unless Mr. Cahill didn't

24   know the difference between retreat programs and the Caritas Creek Environmental Education

25   programs.

26        35.    Defendants admit that Exhibit D was sent on or about January 19, 2007, but deny that

27   any of them had anything to do with its preparation or distribution.  The letter is, in fact, signed by

28   Kristen Burlington, a former program director who was fired on January 19, 2007.

1    36.    Defendants are without sufficient information or belief as to the veracity of the

2    allegations of paragraph 36 of the complaint, and upon that basis deny them.

3    37.    Defendants are without sufficient information or belief as to the veracity of the

4    allegations of paragraph 37 of the complaint, and upon that basis deny them.

5    38.    Defendants deny that anything they have written or said was misleading.  That former

6    campers and schools who attended or utilized the Caritas Creek programs were upset at the high

7    handed and disgraceful actions of Plaintiff and that there was a "firestorm" of criticism and concern

8    was a direct consequence of the Plaintiff's actions as described above.

9    39.    Defendants admit the allegations of paragraph 39 of the complaint.

10    40.    Defendants admit the allegations of paragraph 40 of the complaint.

11    41.    Defendants admit the allegations of paragraph 41 of the complaint.

12    42.    Defendants admit that the website described was established but deny that they

13    established it or exercise any supervision or control over it or its contents.  Defendants did not concede

14    that Plaintiff owns the mark Caritas Creek and in fact demanded in writing that the misstatement be

15    deleted.  It was.  Defendants admit they have registered the domain name CaritasCreek.org and are in

16    process of designing a website.

17    43.    Defendants admit the allegations of paragraph 43 of the complaint.

18    44.    Defendants deny the allegations of paragraph 44 of the complaint.

19    45.    Defendants admit that their counsel sent Exhibit D to Plaintiff on or about April 27,

20    2007.  Defendants deny they admitted that Plaintiff owns or has any rights to the Caritas Creek name

21    and mark and incorporate by reference herein their answer to paragraph 42.

22    46.    Defendants deny the allegations of paragraph 46 of the complaint.  Plaintiff's California

23    registration was obtained by fraud and deceit.  Had the California Secretary of State been fully

24    informed of the facts, the registration would not have been issued.

25

26

27

28

**COUNT I**

47.    Defendants incorporate herein by reference their Answers to Paragraphs 1 through 46 above.

48.    Defendants deny the allegations of paragraph 48 of the complaint.

49.    Defendants deny the allegations of paragraph 49 of the complaint.

50.    Defendants deny the allegations of paragraph 50 of the complaint.

51.    Defendants deny the allegations of paragraph 51 of the complaint.  On the contrary, it is Plaintiff that is misleading the public by attempting to pass off an inferior environmental education program by labeling it Caritas Creek and usurping the good will developed since 1975 by Defendants, their staff, and their predecessors.

52.    Defendants deny the allegations of paragraph 52 of the complaint.  Defendants, not Plaintiff, are the true inheritors of the good will developed from 1975 to 1985 by Defendants' predecessors since they, not Plaintiff, preserved and enhanced the programs without any supervision, direction, or control by Plaintiff after the program was moved to Plaintiff's physical facilities.

53.    Defendants deny the allegations of paragraph 53 of the complaint.  The public associates Caritas Creek with Defendants, not Plaintiff; the use of the name and mark was by Defendants without any supervision, direction, or control by Plaintiff.

54.    Defendants deny the allegations of paragraph 54 of the complaint.  On the contrary, it is Plaintiff that is misleading the public by attempting to pass off an inferior environmental education program by labeling it Caritas Creek and usurping the good will developed since 1975 by Defendants, their staff, and their predecessors.

55.    Defendants deny the allegations of paragraph 55 of the complaint.  Plaintiff's continued use of the Caritas Creek name and mark is likely to cause confusion, mistake, and deception as to the affiliation, connection, or association of Plaintiff with Defendant, and as to the origin, sponsorship, and approval of services rendered under the mark.

56.    Defendants deny the allegations of paragraph 56 of the complaint.  Plaintiff has engaged and is engaged, in federal unfair competition, false representation, and false designation of origin, causing irreparable injury to Defendants and damage to public, in violation of Section 43(a) of

1 | the Lanham Act, 15 U.S.C. § 1125(a).

2 | 57.    Paragraph 57 is a prayer for relief and requires no answer.

3 | **COUNT II**

4 | 58.    Defendants incorporate herein by reference their Answers to Paragraphs 1 through 57

5 | above.

6 | 59.    Paragraph 59 states the Court's basis for jurisdiction and requires no answer.

7 | 60.    Defendants deny the allegations of paragraph 60 of the complaint.  Plaintiff's California

8 | registration was obtained by fraud and deceit.  Had the California Secretary of State been fully

9 | informed of the facts, the registration would not have been issued.

10 | 61.    Defendants deny the allegations of paragraph 61 of the complaint.

11 | **COUNT III**

12 | 62.    Defendants incorporate herein by reference their Answers to Paragraphs 1 through 61

13 | above.

14 | 63.    Paragraph 63 states the Court's basis for jurisdiction and requires no answer.

15 | 64.    Defendants deny the allegations of paragraph 64 of the complaint.  It is Plaintiff that is

16 | engaged in statutory unfair competition, causing irreparable injury to Defendants and damage to the

17 | public.

18 | **COUNT IV**

19 | 65.    Defendants incorporate herein by reference their Answers to Paragraphs 1 through 64

20 | above.

21 | 66.    Paragraph 66 states the Court's basis for jurisdiction and requires no answer.

22 | 67.    Defendants deny the allegations of paragraph 67 of the complaint.  It is Plaintiff that

23 | has violated and is violating the California anti-dilution statute, causing irreparable injury to

24 | Defendants and damage to the public.

25 | **COUNT V**

26 | 68.    Defendants incorporate herein by reference their Answers to Paragraphs 1 through 67

27 | above.

28 | 69.    Paragraph 69 states the Court's basis for jurisdiction and requires no answer.

70.    Defendants deny the allegations of paragraph 70 of the complaint.  It is Plaintiff that has violated and is violating the California false advertising statute causing irreparable injury to the Defendants and damage to the public.

### COUNT VI

71.    Defendants incorporate herein by reference their Answers to Paragraphs 1 through 70 above.

72.    Paragraph 72 states the Court's basis for jurisdiction and requires no answer.

73.    Defendants deny the allegations of paragraph 73 of the complaint.  It is Plaintiff that is engaged in unfair competition under the common law of California causing irreparable injury to Defendants and damage to the public.

WHEREFORE, Defendants pray that judgment be denied to Plaintiff, that Plaintiff takes nothing by this Complaint, and that Defendants have judgment against Plaintiff pursuant to its COUNTERCLAIMS that follow.

### AFFIRMATIVE DEFENSES

1.    Plaintiff Catholic Charities CYO is not the owner of the name and mark CARITAS CREEK; rather Defendant Caritas Creek is the owner of the mark.  When the original Caritas Creek group became affiliated with plaintiff, plaintiff was licensed pursuant to the Agreement, Exhibit 1. Defendants ran the programs at Plaintiff's facilities exercising exclusive control over the nature and quality of the services rendered under the mark until the entire Caritas Creek staff, including several defendants, was summarily fired by Plaintiff. As a licensee, plaintiff is estopped from claiming any ownership rights in the name and mark.

2.    Plaintiff, from 1983 until January, 2007 acquiesced in the exercise by Defendants of control over the nature and quality of the services rendered under the Caritas Creek name and mark and thus is estopped to claim any ownership rights.

3.    Since Plaintiff acquiesced in the exercise of exclusive control by Defendants over the nature and quality of the services rendered under the Caritas Creek name and mark from 1983 until January, 2007, Plaintiff is guilty of laches in asserting its alleged rights.

4.    By doing the acts set forth in the Answer, including obtaining the fraudulent California

1  trademark registration and summarily firing of over 30 employees and evicting some of them from

2  their homes, Plaintiff has unclean hands and thus is barred from any equitable relief from this Court.

3      5.    When Plaintiff applied for its California State registration it was aware of Defendants'

4  competing claim of ownership and thus committed fraud in alleging that it had exclusive rights to the

5  mark, that "no other person, firm, corporation, union or association has the right to use the mark in this

6  state..." since Plaintiff knew of Defendants' claim of rights, and should have known that it was a mere

7  licensee at best.

8                                  **COUNTERCLAIMS**

9      Comes now Caritas Creek, a California corporation and for its counterclaims against Catholic

10  Charities CYO, the Counterclaim defendant, alleges as follows:

11      1.    This is an action for federal unfair competition and false designation of origin under

12  Section 43(a) of the Federal Trademark Action of 1946, as amended (the "Lanham Act"), 15 U.S.C. §

13  1125(a); California statutory unfair competition under Cal. Bus. & Prof. Code § 17200; and common

14  law unfair competition.

15      2.    The Court has subject matter jurisdiction pursuant to Section 39 of the Lanham Act, 15

16  U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.  Counterclaimant engages in activities that

17  affect interstate commerce.  The amount in controversy exceeds $75,000, exclusive of interest and

18  costs.  Those causes which arise under the common law or statutes of the State of California are

19  pendent or ancillary causes under 28 U.S.C. § 1338(b) and are subject to the Court's supplemental

20  jurisdiction.

21      3.    The Court has personal jurisdiction over the Counterclaim defendant as it is engaged in

22  business and is organized in California, and has its principal office in San Francisco, in this District.

23      4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the claims arise in this

24  District and Counterclaim defendant is subject to the personal jurisdiction of this Court.

25      5.    Counterclaimant Caritas Creek is a California corporation having its office in this

26  District.

27      6.    Counterclaim defendant is a non-profit corporation whose headquarters is located at

28  180 Howard Street, Suite 100, San Francisco, California 94105, in this District.

7.   Caritas Creek is a child of the 70's. It is a unique environmental education and camping experience developed by a group of Bay Area educators. The founding members of Caritas Creek were a group of young people with experience in both the Catholic schools of Oakland's inner city and private summer camps where children from more affluent families came to spend their holidays. These friends shared similar interests and philosophies regarding what an outdoor education and summer experience could offer young people. They decided to put their ideas to practice and create a camping experience that would bring children from diverse backgrounds together in an arena that would focus on spiritual matters and the outdoor world.

8.   In 1975, Paula M. Pardini, Frank Sottile, Sally Hartman, Mary Gordon, Greg Gordon, Nancy Olson, and a small group of others incorporated as a California non-profit corporation named Caritas Creek. The name was picked carefully; "*Caritas*" is Latin for "charity" or "God's love," and the members interpreted it for the public as "The Spirit of love in friendship." The word blended into "Creek," just as the camp's mission was to blend spirituality with knowledge and respect of the outdoors.

9.   Frank Sottile, Sally Hartman, and Paula Pardini comprised the original Board of Directors of Caritas Creek. They quickly went to work, locating and leasing Mendocino Woodlands, a redwood forest camp, and school year and summer sessions started immediately. The group located and leased Mendocino Woodlands, a redwood forest camp, and began having camp sessions both during the school year and the summer.

10.  Caritas Creek was unique from other environmental education programs and camps for two reasons: the program's practice of bringing together campers from different socio-economic and racial backgrounds, and the emphasis on campers finding connections to the environment, to themselves, to Spirit, and to their community.

11.  The program at Caritas Creek did not go unnoticed in the community. Throughout 1978, some of the founding members were invited to serve as consultants for public school district environmental education programs. This cross-pollination worked to both enrich the public school programs and to broaden Caritas Creek's own knowledge base.

12.  In 1979, Father Michael Harriman, then Associate Director of CYO, approached the

1    Caritas Creek Board of Directors and invited Caritas Creek to rent the CYO facility in Occidental,

2    California, for its outdoor education program.  The idea was an attractive one to Caritas Creek, as the

3    Occidental site was closer to the Bay Area schools and easier to access and operate from during the

4    winter and spring rainy seasons.

5        13.    The CYO facility was extremely underdeveloped when Caritas Creek began its

6    tenancy.  The staff had to do much physical work to create the homey environment desired for its

7    school groups.  The staff made sacrifices such as sleeping on carpeted risers instead of beds.

8        14.    The rental arrangement between CYO and Caritas continued from 1979 until 1983.  At

9    that point, Caritas Creek had accumulated a debt that was difficult to retire without significantly

10    raising its school program fees, a step it was extremely reluctant to take.  Fr. Harriman, a tremendous

11    supporter of Caritas Creek's mission and program, proposed that Caritas Creek "partner" with CYO.

12    Caritas Creek was hesitant to give up any autonomy, but the group decided that a "partnership" would

13    be a win/win situation.  CYO would assume Caritas Creek's debt and manage its financial matters.

14    Caritas Creek would run its program through CYO, maintaining control over the program philosophy,

15    content, direction, and staffing. Caritas Creek saw it as a chance to bring its program to a larger group

16    of young people and schools.  Financially, CYO would benefit because it would channel the Caritas

17    Creek income to help support the facility and much needed capital improvements.  Caritas Creek paid

18    an additional administrative fee to CYO to support the organization and help pay for the director's

19    salary.  These improvements would benefit CYO and the other camps, programs, and entities which

20    regularly leased the facilities.

21        15.    Two documents exist from 1983 that reflect the understandings of Caritas Creek and

22    CYO. The first is Exhibit 1 that notes that an agreement was reached between Caritas Creek and CYO

23    concerning "the ownership and operation of Caritas Creek's Environmental Education Program."

24        16.    The Agreement, Exhibit 1,  lists four obligations for each party to meet.  Caritas Creek

25    is to present to CYO:  (1) a complete Environmental Education File System, (2) expert knowledge in

26    the operations of an Environmental Education Program, (3) past and present personnel records, and (4)

27    a list of present and potential school clientele.  In return, CYO is to: (1) offer first refusal rights to

28    former Caritas Creek Environmental Education Directors for any CYO Environmental Education

1  Director position, (2) allow Directors to hire Teacher/Naturalist staff, (3) allow Directors to operate

2  and maintain the Environmental Education Program to the standards established by Caritas Creek, and

3  (4) absorb the balance of Caritas Creek's debt related to its lease of the McGucken Center in 1982 -

4  1983.

5        17.    After listing these obligations, the agreement notes that program name recognition is

6  important to the longevity of the Environmental Education Program, and states that the parties agree to

7  title the program, "CYO-Caritas Environmental Education Program." The combined name was

8  deliberately chosen to reflect the "partnership" of the two programs.

9        18.    The Agreement continues to note that each party retains ownership of its equipment,

10  and notes that CYO must compensate Caritas Creek if it uses Caritas's equipment. The parties then

11  agree that they are not responsible for each other's future debts. The agreement shows the clear

12  intention that these parties were still considered to be separate entities.

13        19.    At the bottom of the typewritten agreement is a single handwritten sentence, "Logo -

14  This year we will allow CYO to use our logo for this year Sept. 83 - Sept. 84 and must be renewed

15  each year." Although obviously not written by a lawyer, this note shows the clear intention by Caritas

16  Creek not to abandon ownership of its name and trademark. Caritas Creek wanted to ensure its ability

17  to walk away from the table with what was brought to it if the arrangement were not to work out.

18        20.    The second document from 1983 is an Open Letter to CYO from Caritas Creek, Exhibit

19  2. The letter states that Caritas Creek has planned an exciting environmental education program for

20  students and it provides a detailed list of the precise steps that Caritas Creek is taking to achieve its

21  goals, including recruiting from a full spectrum of social, economic, ethnic, and religious

22  backgrounds. Another requirement is that the Caritas Creek member serving as the Environmental

23  Education Program Director shall have all rights and privileges in the hiring and firing of the

24  Teacher/Naturalist staff. This document shows that Caritas Creek was maintaining control over its

25  program despite its arrangement with CYO.

26        21.    In 1984, Paula Pardini accepted the position of directorship of a new CYO division

27  called Outdoor Ministry. This division included the Caritas Environmental Education Program, the

28  summer camp, and a ropes course. At this point, Caritas Creek ceased holding its summer camp in

ANSWER AND COUNTERCLAIMS
Case No. C 07-02658 SI

1  Mendocino.

2      22.    From 1983 to the early 90's, there were minimal conflicts between CYO and Caritas

3  Creek. CYO's leadership consisted of Executive Director Mike Marovich and Associate Director Fr.

4  Mike Harriman, each of whom were enthusiastic supporters of the Caritas program. During these

5  years, Frank Sottile and Paula Pardini led Caritas Creek with virtually no oversight or input from CYO

6  in the leadership and operations of the program. It was Caritas Creek staff who recruited schools,

7  signed the contracts with schools, scheduled camps, hired and trained staff, designed the program,

8  created new activities, and conducted weekly and seasonal evaluations of the staff and program

9  activities to determine if they were valid and supportive of the core mission.

10      23.    The symbiotic relationship that had continued for a decade became strained in 1993 as

11  the CYO administrators who made the arrangements with Caritas Creek began to leave the agency and

12  be replaced by new staff. Mike Marovich's and Fr. Mike Harriman's positions were filled by Brian

13  Cahill and Glen Matola, respectively. These new directors expected the Caritas Creek directors to

14  participate in CYO at the corporate level, taking valuable time away from camp leadership and

15  programming. Caritas Creek members were expected to bear the time burden of dual responsibilities,

16  leading to feelings that work schedules and salaries were unfair.

17      24.    It became apparent to the Caritas Creek founding members that the environmental

18  education program they had grown for over twenty years was being compromised. Requests to CYO

19  administration were ignored or refuted. Costs to use the Occidental facility kept increasing and

20  seemed unjust. In or about 1995, the Caritas Creek leadership conducted an independent survey

21  among other Bay Area environmental education programs. The intent was to get comparison figures,

22  and ultimately they discovered that CYO was charging Caritas Creek more per person usage than they

23  would have paid at other facilities. The Caritas Creek leadership seriously considered withdrawing

24  Caritas Creek EEP from CYO at that time to be rid of the extra financial burden and the program time

25  interference.

26      25.    Exhausted and disillusioned in her role as Director of Caritas Creek and of the Outdoor

27  Ministry, Paula Pardini decided she had no choice but to leave the program. She and Frank Sottile

28  planned to exit Caritas Creek in a timely manner so that the program would not be jeopardized, and so

1   that they would have the time to further train the newest Caritas Creek administrator, Paul Raia.

2       26.     Ms Pardini was in the process of securing another position as principal of an Oakland

3   Diocesan Catholic school when she was forced by CYO administration to resign from Caritas Creek in

4   March, 2000.  The associate director resigned shortly thereafter.  Paul Raia, who was raised within the

5   Caritas Creek EEP tradition at both Mendocino and Occidental, was CYO's chosen replacement as

6   director.

7       27.     Paul Raia continued to run the Caritas Creek EEP as the founders had envisioned, and

8   he consulted frequently with Ms Pardini and the Caritas Creek family regarding the leadership of the

9   Caritas Creek program, its environmental education program, and its relationship with CYO.  As a

10  result, Ms Pardini continued to refer schools and campers to Caritas Creek EEP, knowing that Mr.

11  Raia's leadership would ensure that campers would continue to receive the unique quality experience

12  that the community had come to associate with Caritas Creek programming and services.

13      28.     During Mr. Raia's reign as Director of Outdoor Ministries, tensions between the Caritas

14  Creek staff and the CYO administration peaked.  CYO merged with Catholic Charities and the newly

15  formed Catholic Charities CYO (hereinafter "CYO") began efforts to move the program toward a

16  more sterile and widely marketable approach.

17      29.     In January 2005, Glenn Motola, the HIV Director at CYO, made his first visit to

18  Caritas Creek.  He had no further substantive contact with the program until June 2005, when he

19  visited an administrative meeting and suggested that the traditional Caritas Creek model of mixing

20  diverse ethnic and socio-economic groups of young people was actually doing more damage than

21  good, as it allegedly made the poor kids feel poorer, and the rich kids feel richer.  A suggestion was

22  made to have special sessions specifically for the poor kids to attend camp.  Caritas Creek staff was

23  severely offended by this objection from CYO to a core tenet of its program.

24      30.     In 2006, Dr. Motola again visited a Caritas Creek administrative meeting,  Throughout

25  the meeting, Dr. Motola disparaged the leadership and programs of Caritas Creek, telling the

26  Teachers/Naturalists that he was nervous to leave kids alone with them, prompting them to have to

27  remind him that they were all professional childcare workers who deserved respect.

28      31.     Throughout the winter of 2007, meetings occurred to discuss Caritas Creek, though

1   Paul Raia was not invited to attend. In January 2007, Dr. Motola admitted to Mr. Raia that he had

2   gone to the CYO Board of Directors with a request to halt the Caritas Creek program in late summer

3   of 2006.

4        32.    In mid-January, Teacher/Naturalists reported to camp for training for the upcoming

5   spring season of EEP. They had two portentous meetings, first on January 17 and then on January 19.

6        33.    The first meeting involved Caritas Creek staff and representatives from CYO, namely,

7   Dr. Motola, Jennifer Bilyk, Tere Brown, and Steve Grant. Paul Raia was called by Jennifer Bilyk and

8   asked not to attend the meeting, a fact that was withheld by CYO from the Caritas staff when they

9   inquired as to his whereabouts. Dr. Motola presented the staff with a list of twelve changes that he

10  wanted made to the Caritas program. The staff met independently and agreed to nine of the twelve

11  changes. The three which they could not endorse dropping were the socio-economic mixing of cabin

12  groups and two traditional activities called "Celebrations" and "Serendipities," communicative

13  activities through which the campers processed their experiences and shared them with their groups,

14  gaining deeper understand of themselves, each other, and the world.

15       34.    The staff let CYO know that, although they may agree to change certain aspects of the

16  Celebrations and Serendipities, they were not willing to get rid of them altogether. The staff requested

17  more clarity on the desired changes and information concerning what would happen if they did not

18  accept the changes.

19       35.    The staff's questions were answered in the most abrupt fashion in their next meeting, on

20  January 19. In attendance for CYO were Dr. Motola, Jennifer Bilyk, Steve Grant, Alexander

21  Lawrence (Human Resources Director for CYO), and Executive Director Brian Cahill. Paul Raia was

22  again excluded. Mr. Cahill wasted little time before letting the staff know that, due to the staff's

23  unwillingness to compromise, he had to "pull the plug" on Caritas Creek. He stated that the

24  environmental education program would be "re-tooled." He did not say when camp would reopen.

25       36.    The staff members, some of whom had returned from working and living on the east

26  coast just that week in preparation for spring session, were immediately handed eviction notices

27  advising that they had 60 days to move out of staff housing. They were also provided with three

28  weeks of severance pay.

1  set forth in the Prayer for Relief below.

2  **SECOND COUNTERCLAIM**

3      43.    Counterclaimant incorporates by reference paragraphs 1 through 41 of the

4  Counterclaim and 1 through 46 of the Answer as if set forth herein.

5      44.    The Court has original jurisdiction over this pendent claim pursuant to 28 USC §

6  1338(b) and supplemental jurisdiction pursuant to 28 USC § 1367.

7      45.    By its acts, Counterclaim defendant has engaged, and is engaged in unfair competition

8  prohibited by California Business and Professions Code § 17200 to the irreparable injury of the

9  counterclaimant and to the public.

10      46.    WHEREFORE counterclaimant requests judgment against counterclaim defendant as

11  set forth in the Prayer for Relief below.

12  **THIRD COUNTERCLAIM**

13      47.    Counterclaimant incorporates by reference paragraphs 1 through 45 of the

14  Counterclaim and 1 through 46 of the Answer as if set forth herein.

15      48.    The Court has original jurisdiction over this pendent claim pursuant to 28 USC §

16  1338(b) and supplemental jurisdiction pursuant to 28 USC § 1367.

17      49.    By its acts, Counterclaim defendant has engaged, and is engaged in unfair competition

18  prohibited by the common law of California to the irreparable injury of the counterclaimant and to the

19  public.

20      50.    WHEREFORE counterclaimant requests judgment against counterclaim defendant as

21  set forth in the Prayer for Relief below.

22  **PRAYER FOR RELIEF**

23  Counterclaimant prays for judgment against the counterclaim defendant as follows:

24      1.    For an order preliminarily and permanently enjoining Counterclaim defendant and

25  their, agents, employees, attorneys and distributors, and all persons acting by, under, or in concert with

26  them or with any of them, from:

27      (a)    registering or using Counterclaimant's "CARITAS CREEK" service mark, or

28  any mark confusingly similar thereto, as all or part of any trademark, service mark, trade name

1    37.    Dr. Motola spoke specifically about the Caritas Creek name at the first meeting on

2    January 17, 2007. He told the staff that the next year would be different, with a different program and

3    likely a different name. He said that it would probably not be called Caritas Creek, giving the

4    impression to those present that CYO had no interest in continuing to be associated with Caritas

5    Creek. CYO was to move forward with a new camp program and new camp name.

6    38.    At no time from when Caritas was born in 1975 to when the 2007 spring session was

7    cancelled by CYO did Caritas Creek cease use of the CARITAS CREEK mark or trade name. At no

8    time did Caritas Creek cease to compensate CYO for its facilities and administrative support. At no

9    time did Caritas give up sole control of the leadership or programs of Caritas Creek Environmental

10    Education Program. Caritas was always in control of its mark, ensuring that schools and campers

11    would know what to expect when attending a program carrying the Caritas Creek name. The staff was

12    so protective of the character of the Caritas Creek program that they were willing to give up their jobs

13    and residences rather than carry on without the defining characteristics of the program. CYO claims

14    ownership of the name in order to use it for an entirely different type of program, which will confuse

15    and deceive schools and young people.

16    **FIRST COUNTERCLAIM**

17    39.    Counterclaimant incorporates by reference paragraphs 1 through 38 of the

18    Counterclaim and 1 through 46 of the Answer as if set forth herein.

19    40.    Counterclaimant and its predecessors have made substantial, continuous, and exclusive

20    use of the name and mark CARITAS CREEK since 1975 in connection with the offering and

21    providing of environmental education services and day camp, recreational camp, and summer camp

22    services.

23    41.    Counterclaim defendant has made claims of right to the identical mark for identical

24    services despite its status as a licensee of Counterclaimant's mark and name. By its acts, Counterclaim

25    defendant has engaged, and is engaged in unfair competition, false representations, and false

26    designation of origin all to the irreparable injury of the counterclaimant and to the public in violation

27    of Section 43(a) of the Lanham Act, 15 USC § 1125(a).

28    42.    WHEREFORE counterclaimant requests judgment against counterclaim defendant as

or Internet domain name in the future;

(b)    infringing Counterclaimant's "CARITAS CREEK" name and service mark, including all written and spoken terms equivalent or confusingly similar thereto, including by not necessarily limited to "CARITAS CREEK;"

(c)    using Counterclaimant's "CARITAS CREEK" name and service mark, or any name or mark reminiscent of or confusingly similar thereto, including but not necessarily limited to "CARITAS CREEK," for any product or service, or in any letterhead, sign, advertising or promotion, e-mail or other sales solicitation or business listing, either in print, broadcast, electronic or other form, either separately or compositely with other words, as a trademark, service mark or trade name;

(d)    using Counterclaimant's "CARITAS CREEK" name and service mark, or any name or mark confusingly similar thereto, including but not necessarily limited to "CARITAS CREEK," as a corporate and/or trade name or portion thereof;

(e)    making representations, directly or indirectly, to anyone, anywhere, by any means, that Counterclaim defendant is related, associated or affiliated in any way with Counterclaimant or its business operations or programs;

(f)    in any manner imitating Counterclaimant's "CARITAS CREEK" name and service mark similar thereto, for the purpose of acquiring the trade and good will of Counterclaimant by association, imitation, fraud, mistake or deception; and

(g)    unfairly competing with Counterclaimant in any manner.

2.    For an order holding that Counterclaim defendant's acts aforesaid constitute federal unfair competition, false representation, and false designation of origin, violation of the California statutory unfair competition statute; and common law unfair competition.

3.    For an order directing Counterclaim defendant to file with this Court and serve upon Counterclaimant within (30) days after service of injunction, a report in writing oath, setting forth in detail the manner and form in which Counterclaim defendant has complied with, and will continue to comply with, the injunction and further orders of this Court.

4.    For damages in such amount as may appear appropriate following a trial on the merits,

1  plus profits and costs of suit, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. §1117(a).

2       5.     For costs and attorney fees pursuant to 15 U.S.C. §1117(a).

3       6.     For an order canceling Counterclaim defendant's California registration.

4       7.     For such other and further relief as the Court may deem just and proper.

5  Dated: July 27, 2007                TOWNSEND AND TOWNSEND AND CREW LLP

6                                 By:

7                                    PAUL W. VAPNEK

8                                    Attorney for Defendants and Counterclaimant

9

### DEMAND FOR JURY TRIAL

10       Defendants and Counterclaimant hereby demand a jury trial as provided by Rule 38(a) of the

11  Federal Rules of Civil Procedure.

12                                 By:

13                                    PAUL W. VAPNEK

14                                    Attorney for Defendants and Counterclaimant

15

### VERIFICATION

16

17       The undersigned being hereby warned the willful false statements and the like are so made
punishable by fine imprisonment, or both, under 18 U.S.C. § 1001, states that I am an attorney at law

18  duly admitted and licensed to practice before this Court and all courts of this State and am one of the
attorneys of record for the defendants in this action, that I have read the foregoing Answer and

19  Counterclaim and know the contents thereof. The same is true of my own knowledge except as to
those matters which are alleged on information and belief, and as to those matters, I believe it to be

20  true. I make this verification because the facts set forth in the Answer and Counterclaim are within my
knowledge and because the defendants are absent from the County of San Francisco where I have my

21  office, and that all of the exhibits appended to this Answer and Counterclaim are authentic
reproductions of what they purport to be.

22

23

24                               By:

25                                    Paul W. Vapnek

26  61107734 v1

27

28