1  PAUL W. VAPNEK (State Bar No. 36576)
   JOHN E. LORD (State Bar No. 216111)
2  JUDITH M. SCHVIMMER (State Bar No. 230285)
   Two Embarcadero Center, 8th Floor
3  San Francisco, California  94111
   Telephone: (415) 576-0200
4  Facsimile: (415) 576-0300
   Email:  pwvapnek@townsend.com
5          jelord@townsend.com
           jmschvimmer@townsend.com
6
   *Attorneys for Defendants,*
7  MARY W. GORDON, ERIK "WITAKE" OBERG,
   EMILY WOOD ORDWAY, PAULA PARDINI,
8  and CARITAS CREEK

9

10

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13

14

15  CATHOLIC CHARITIES CYO, a California,        Case No.   C07-02658 SI

16              Plaintiff,                       **DEFENDANTS' OPPOSITION TO
                                                 PLAINTIFF'S MOTION FOR
17         v.                                    PRELIMINARY INJUNCTION**

18  MARY W. GORDON, A California resident;
    ERIK "WITAKE" OBERG, a California            **DATE:**   August 17, 2007
19  resident; EMILY WOOD ORDWAY, a              **TIME:**   9:00 a.m.
    California resident; PAULA PARDINI, a        **DEPT:**   Courtroom 10, 19th Floor
20  California resident; and CARITAS CREEK, a    **JUDGE:**  The Honorable Susan Illston
    California corporation,
21
                Defendants.
22

23

24

25

26

27

28

  
# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 2

III.  PLAINTIFF CANNOT SHOW LIKELIHOOD OF SUCCESS ON THE
      MERITS .......................................................................................................... 10

      A.   The Caritas Creek Service Mark Has Never Been Abandoned ................... 10

           1.   The Caritas Creek Mark Has Been in Systematic and
                Continuous Use Since 1975, and, Therefore, There Can Be No
                Finding of Non-Use .......................................................................... 11

           2.   The Licensing of the Mark to CYO in 1983 Was Not a "Naked
                License" -- Caritas Creek Maintained Full Ownership and
                Control of the Mark After the Granting of the License. .................. 12

      B.   The Doctrine of Licensee Estoppel Will Also Preclude CYO From
           Succeeding on the Merits of the Claim ...................................................... 16

IV.   AN INJUNCTION WILL CAUSE HARM TO THE PUBLIC INTEREST
      BECAUSE OF THE LIKELIHOOD OF CONFUSION ....................................... 18

V.    CYO WILL NOT SUFFER IRREPARABLE HARM SHOULD THE
      COURT DENY THE INJUNCTION .................................................................. 19

VI.   CONCLUSION ............................................................................................... 21

# TABLE OF AUTHORITIES

Page

**Cases**

Barcamerica International USA Trust v. Tyfield Importers, Inc.,
    289 F.3d 589 (9th Cir. 2002) ........................................................................... 15

Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,
    584 F.2d 308 (9th Cir. 1978) ........................................................................... 10

Doeblers' Pa. Hybrids, Inc. v. Doebler,
    442 F.3d 812, 822 (3rd Cir. 2006) ................................................................... 11

Echo Drain v. Newsted,
    307 F. Supp. 2d 1116 (C.D. Cal. 2003) ........................................................... 10

Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.,
    458 F.3d 931 (9th Cir. 2006) ............................................................... 10, 11, 12

First Interstate Bancorp. v. Stenquist,
    18 USPQ2D 1159 (N.D. Cal. 1990) ........................................................... 15, 16

Imperial Tobacco Ltd. v. Philip Morris,
    899 F.2d 1575 (Fed. Cir. 1990) ....................................................................... 12

Pacific Supply Cooperative v. Farmers Union Cent. Exchange, Inc.,
    318 F.2d 894 (9th Cir. 1963) ........................................................................... 17

Printers Services Co. v. Printer Services Company,
    1991 U.S. Dist. LEXIS 20561, *13-14 (C.D. Cal. 1991) ............................... 17

Rivard v. Linville,
    133 F.3d 1446 (Fed. Cir. 1998) ....................................................................... 11

Sega Enterprises Ltd. v. Accolade, Inc.,
    977 F.2d 1510 (9th Cir. 1992) ......................................................................... 10

Transgo, Inc. v. AJAC Transmission Parts Corp.,
    768 F.2d 1001 (9th Cir. 1985) ......................................................................... 15

Villanova University v. Villanova Alumni Educational Foundation, Inc.,
    123 F. Supp. 2d 293 (E.D. Pa. 2000) ............................................................... 17

**Statutes**

15 U.S.C. § 1127 ............................................................................................. 10, 11

Lanham Act § 5 ..................................................................................................... 17

McCarthy on Trademarks and Unfair Competition § 18:63 (4th ed. 2007) ... 16, 17

## I.    INTRODUCTION

Plaintiff Catholic Charities CYO's ("CYO") Motion for Preliminary Injunction should be denied because Defendants (collectively, "Caritas Creek") are the rightful owner of the CARITAS CREEK mark.  CYO seeks ownership of a mark which never belonged to them, and they wish to use it with a program significantly changed from the one associated with the mark in the minds of the public.

Caritas Creek has used the CARITAS CREEK mark continuously since 1975.  This use was exclusive for the first eight years, as Caritas Creek operated its environmental education and camp programs independently.  In 1983, Caritas Creek entered into a relationship with CYO, by which Caritas Creek provided CYO with a renowned environmental education program and income flow used to cover the rental of the facilities and contribute to CYO's capital expenses, and CYO provided Caritas Creek with relief from a debt and some supportive infrastructure.  For many years, it was a happy relationship and a win-win situation.

As in many relationships, tensions eventually came to bear upon the two groups, with CYO not interested in continuing the environmental educations programs as they had always been run, and Caritas Creek not interested in letting go of what they perceive to be core components of their programs.  Caritas Creek voiced their intention to continue offering their programs in the manner which the public had learned to expect, and CYO responded by ending the relationship and evicting Caritas Creek from the premises with the message that they should go run their program elsewhere.  Then, something happened to change CYO's mind, and they decided to try to move forward with the name that they had just dismissed.

While Caritas Creek and CYO were working together, Caritas maintained control, direction, and supervision of its mark and programs.  There was never an agreement between the parties for Caritas Creek to sell the mark or programs to CYO.  In fact, Caritas Creek expressly licensed the mark to CYO.  There was never an abandonment or a loss of control of either the mark or programs by Caritas Creek.  Perhaps even more importantly, the Caritas Creek name has stood for something specific for over thirty years to the schools and families who send their children to the program.  It would be deceptively misleading to the public for CYO to now offer a new program under the

1   CARITAS CREEK mark.

2        Further, an injunction would irreparably harm Caritas Creek, effectively shutting it down

3   completely. Thus, CYO cannot prove success on the merits of its claims, and the injunction they seek

4   would harm the public interest and irreparably harm Caritas Creek. CYO's Motion for Preliminary

5   Injunction should be denied.

6        At the minimum, the proper ownership of the CARITAS CREEK mark is a factual inquiry that

7   will need to be decided at a later stage in litigation after discovery, and should not be decided now at

8   the Preliminary Injunction Stage. Therefore, Caritas Creek respectfully requests that the Court deny

9   CYO's Motion for Preliminary Injunction.

10  **II.    STATEMENT OF FACTS**

11        Caritas Creek is a child of the 70's. It is a unique environmental education and camping

12  experience developed by a group of Bay Area educators. The founding members of Caritas Creek

13  were a group of young people with experience in both the Catholic schools of Oakland's inner city and

14  private summer camps where children from more affluent families came to spend their holidays.

15  These friends shared similar interests and philosophies regarding what an outdoor education and

16  summer experience could offer young people. They decided to put their ideas to practice and create a

17  camping experience that would bring children from diverse backgrounds together in an arena that

18  would focus on spiritual matters and the outdoor world. *See* accompanying Declarations of Paula M.

19  Pardini ¶ 5 ("Pardini Decl.") and Mary M. Gordon ¶ 3 ("M. Gordon Decl."), filed herewith.

20        In 1975, Paula M. Pardini, Frank Sottile, Sally Hartman, Mary Gordon, Greg Gordon, Nancy

21  Olson, and a small group of others incorporated as a California non-profit corporation named Caritas

22  Creek. The name was picked carefully; "*Caritas*" is Latin for "charity" or "God's love," and the

23  members interpreted it for the public as "The Spirit of Love in Friendship." The word blended into

24  "Creek," just as the camp's mission was to blend spirituality with knowledge and respect of the

25  outdoors. Pardini Decl., ¶ 6; M. Gordon Decl., ¶ 4.

26        Frank Sottile, Sally Hartman, and Paula Pardini comprised the original Board of Directors of

27  Caritas Creek. They quickly went to work, locating and leasing Mendocino Woodlands, a redwood

28

1  forest camp, and school year and summer sessions started immediately.  Pardini Decl., ¶ 6; M. Gordon

2  Decl., ¶ 4.

3      Caritas Creek was unique from other environmental education programs and camps for two

4  reasons:  the program's practice of bringing together campers from different socio-economic and racial

5  backgrounds, and the emphasis on campers finding connections to the environment, to their selves, to

6  Spirit, and to their community.   Pardini Decl., ¶¶ 4,10; M. Gordon Decl., ¶ 6; *see also* accompanying

7  Declaration of David Gordon ¶¶ 5, 6 ("D. Gordon Decl.").

8      The program at Caritas Creek did not go unnoticed in the community.  Pardini Decl., ¶ 10; M.

9  Gordon Decl., ¶ 6. Throughout 1978, some of the founding members were invited to serve as

10 consultants for public school district environmental education programs.  This cross-pollination

11 worked to both enrich the public school programs and to broaden Caritas Creek's own knowledge

12 base.

13     In 1979, Father Michael Harriman, then Associate Director of CYO, approached the Caritas

14 Creek Board of Directors and invited Caritas to rent the CYO facility in Occidental, California, for

15 Caritas Creek's outdoor education program.   The idea was an attractive one to Caritas Creek, as the

16 Occidental site was closer to the Bay Area schools and easier to access and operate from during the

17 winter and spring rainy seasons.  Pardini Decl., ¶ 9; M. Gordon Decl., ¶ 5; *see also* accompanying

18 Declarations of Frank Sottile ¶ 4 ("Sottile Decl.") and Nancy Olson ¶ 5 ("Olson Decl.").

19     The CYO facility was extremely underdeveloped when Caritas Creek began its tenancy.  The

20 Caritas Creek staff had to do much physical work to create the homey environment desired for its

21 school groups.  The staff made sacrifices such as sleeping on carpeted risers instead of beds.

22     The rental arrangement between CYO and Caritas Creek continued from 1979 until 1983.  At

23 that point, Caritas Creek had accumulated a debt that was difficult to retire without significantly

24 raising its school program fees, a step it was extremely reluctant to take.  Fr. Harriman, a tremendous

25 supporter of Caritas Creek's mission and program, proposed that Caritas Creek partner with CYO.

26 Caritas Creek was hesitant to give up any autonomy, but the groups decided that a partnership would

27 be a win/win situation.  CYO would assume Caritas Creek's debt and manage its financial matters.

28 Caritas Creek would run its program through CYO, maintaining control over the program philosophy,

1    content, direction, and staffing. Caritas Creek saw it as a chance to bring their program to a larger

2    group of young people and schools.  Pardini Decl., ¶¶ 9, 13, 14; M. Gordon Decl., ¶¶ 9, 10; Sottile

3    Decl., ¶ 4; Olson Decl., ¶ 5.

4         Financially, CYO would benefit because it would channel the Caritas Creek income to help

5    support the facility and much needed capital improvements.  Caritas Creek paid an additional

6    administrative fee to CYO to support the organization and help pay for the director's salary.  These

7    improvements would benefit CYO and the other camps, programs, and entities which regularly leased

8    the facilities.  Pardini Decl., ¶ 13; M. Gordon Decl., ¶ 9; Sottile Decl., ¶ 8; Olson Decl., ¶ 5.

9         Two known contemporaneous documents exist from the 1983 partnering.  The first is a one

10   page document, accepted by both parties, titled, "An Agreement Between Caritas Creek and The

11   Catholic Youth Organization of the San Francisco Archdiocese Concerning an Environmental

12   Education Program" ("Agreement"), and it notes that an agreement was reached between Caritas

13   Creek and CYO concerning "the ownership and operation of Caritas Creek's Environmental Education

14   Program." Exhibit 1 to Defendants' Answer, Affirmative Defenses, and Counterclaims, filed herewith

15   ("Exhibit 1").

16        The Agreement, dated September 6, 1983, lists four obligations for each party to meet.  Caritas

17   Creek is to present to CYO:  (1) a complete Environmental Education File System, (2) expert

18   knowledge in the operations of an Environmental Education Program, (3) past and present personnel

19   records, and (4) a list of present and potential school clientele.  In return, CYO is to: (1) offer first

20   refusal rights to former Caritas Creek Environmental Education Directors for any CYO Environmental

21   Education Director position,  (2) allow Directors to hire Teacher/Naturalist staff, (3) allow Directors to

22   operate and maintain the Environmental Education Program to the standards established by Caritas

23   Creek, and (4) absorb the balance of Caritas Creek's debt related to its lease of the McGucken Center

24   in 1982 - 1983.

25        After listing these obligations, the agreement notes that program name recognition is important

26   to the longevity of the Environmental Education Program, and states that the parties agree to title the

27   program "CYO-Caritas Environmental Education Program."  The combined name was deliberately

28   chosen to reflect the partnership of the two programs.

1    The Agreement continues to note that each party retains ownership of its equipment, and notes

2    that CYO must compensate Caritas Creek if it uses Caritas Creeks's equipment.  The parties then agree

3    that they are not responsible for each other's future debts.  The agreement shows the blatant intention

4    that these parties were still considered to be separate entities and not the subject of a merger or

5    acquisition.

6    At the bottom of the type-written Agreement is a single handwritten sentence, "Logo - This

7    year we will allow CYO to use our logo for this year Sept. 83 - Sept. 84 and must be renewed each

8    year."  Although obviously not written by a lawyer, this note shows the clear intention by Caritas

9    Creek to not abandon ownership of their name and trademark.  They wanted to ensure their ability to

10    walk away from the table with what they brought with them if the partnership were not to work out.

11    Sottile Decl., ¶ 5; Olson Decl., ¶¶ 6, 7.

12    The second document from 1983 is an open letter to CYO from Caritas Creek.  The letter

13    states that Caritas Creek has planned an exciting environmental education program for students and it

14    provides a detailed list of the precise steps that Caritas Creek takes to achieve its goals, including

15    recruiting from a full spectrum of social, economic, ethnic, and religious backgrounds.  Another

16    requirement is that the Caritas Creek member serving as the Environmental Education Program

17    Director shall have all rights and privileges in the hiring and firing of the Teacher/Naturalist staff.

18    This document shows that Caritas Creek was maintaining control over its program despite its

19    partnering with CYO.  Exhibit 2 to Defendants' Answer, Affirmative Defenses, and Counterclaims,

20    filed herewith ("Exhibit 2").

21    In 1984, Paula Pardini accepted the position of directorship of a new CYO division called

22    Outdoor Ministry.  This division included the Caritas Creek Environmental Education Program, the

23    summer camp, and a ropes course.  At this point, Caritas Creek ceased holding its summer camp in

24    Mendocino.  Pardini Decl., ¶ 12.

25    From 1983 to the early 90's, there were minimal conflicts between CYO and Caritas Creek.

26    CYO's leadership consisted of Executive Director Mike Marivich and Associate Director Fr. Mike

27    Harriman, each of whom were enthusiastic supporters of the Caritas Creek program.  During these

28    years, Frank Sottile and Paula Pardini led Caritas Creek with virtually no oversight or input from CYO

1  in the leadership and operations of the program.  It was Caritas Creek staff who recruited schools,

2  signed the contracts with schools, scheduled camps, hired and trained staff, designed the program,

3  created new activities, and conducted weekly and seasonal evaluations of the staff and program

4  activities to determine if they were valid and supportive of the core mission.  Pardini Decl., ¶ 15; M.

5  Gordon Decl., ¶¶ 10, 12; Sottile Decl., ¶¶ 6, 7.

6          The symbiotic relationship that had continued for a decade became strained in 1993 as the

7  CYO administrators who made the arrangements with Caritas Creek began to leave the agency and be

8  replaced by new staff.  Mike Marivich's and Fr. Mike Harriman's positions were filled by Brian Cahill

9  and Glenn Motola, respectively.  These new directors  expected the Caritas Creek directors to

10  participate in CYO at the corporate level, taking valuable time away from camp leadership and

11  programming.  Caritas Creek members were expected to bear the time burden of dual responsibilities,

12  leading to feelings that work schedules and salaries were unfair.  Pardini Decl., ¶¶ 15, 16; M. Gordon

13  Decl., ¶¶ 10, 12; Sottile Decl., ¶¶ 6, 7.

14          It became apparent to the Caritas Creek founding members that the environmental education

15  program they had grown for over twenty years was being compromised.  Requests to CYO

16  administration were ignored or refuted.  Costs to use the Occidental facility kept increasing and

17  seemed unjust.  In or about 1995, the Caritas Creek leadership conducted an independent survey

18  amongst other Bay Area environmental education programs.  The intent was to get comparison

19  figures, and ultimately they discovered that CYO was charging Caritas Creek more per person usage

20  than they would have paid at other facilities.  The Caritas Creek leadership seriously considered

21  withdrawing Caritas Creek EEP from CYO at that time to be rid of the extra financial burden and the

22  program time interference.  Pardini Decl., ¶¶ 15, 16; M. Gordon Decl., ¶¶ 10, 12; Sottile Decl., ¶¶ 6, 7.

23          Exhausted and disillusioned in her role as Director of Caritas Creek and of the Outdoor

24  Ministry, Paula Pardini decided she had no choice but to leave the program.  She and Frank Sottile

25  planned to exit Caritas Creek in a timely manner so that the program would not be jeopardized, and so

26  that they would have the time to further train the newest Caritas Creek administrator, Paul Raia.

27  Pardini Decl., ¶ 17.

28          Ms Pardini was in the process of securing another position as principal of an Oakland

- 6 -

1   Diocesan Catholic school when she was forced by CYO administration to resign from Caritas Creek in

2   March 2000.  The associate director resigned shortly thereafter.  Paul Raia, who was raised within the

3   Caritas Creek EEP tradition at both Mendocino and Occidental, was CYO's chosen replacement as

4   director. Pardini Decl., ¶ 18.

5        Paul Raia continued to run the Caritas Creek EEP as the founders had envisioned, and he

6   consulted frequently with Ms Pardini regarding the leadership of Caritas Creek, its environmental

7   education program, and its relationship with CYO.  As a result, Ms Pardini continued to refer schools

8   and campers to Caritas Creek EEP, knowing that Mr. Raia's leadership would ensure that campers

9   would continue to receive the unique quality experience that the community had come to associate

10  with Caritas Creek.  Pardini Decl., ¶¶ 19, 20.

11       During Mr. Raia's reign as Director of Outdoor Ministries, tensions between the Caritas Creek

12  staff and the CYO administration peaked.  CYO merged with Catholic Charities and the newly formed

13  Catholic Charities CYO began efforts to move the program toward a more sterile and widely

14  marketable approach.

15       In January 2005, Glenn Motola, the HIV Director at CYO, made his first visit to Caritas Creek.

16  He had no further substantive contact with the program until June 2005, when he visited an

17  administrative meeting and suggested that the traditional Caritas Creek model of mixing diverse ethnic

18  and socio-economic groups of young people was actually doing more damage than good, as it made

19  the poor kids feel poorer, and the rich kids feel richer.  A suggestion was made to have special

20  sessions specifically for the poor kids to attend camp.  Caritas Creek staff was severely offended by

21  this objection from CYO to a core tenet of its program. *See* Declaration of Erik Oberg ¶ 7 ("Oberg

22  Decl.").

23       In 2006, Dr. Motola again visited a Caritas Creek administrative meeting, in part to address

24  CYO's objections over the coming out of a gay cabin leader to his campers.  Throughout the meeting,

25  Dr. Motola disparaged the leadership and programs of Caritas Creek, telling the Teachers/Naturalists

26  that he was nervous to leave kids alone with them, prompting them to have to remind him that they

27  were all professional childcare workers who deserved respect.

28       Throughout the winter of 2007, meetings occurred to discuss Caritas Creek, though Paul Raia

1    was not invited to attend. In January 2007, Dr. Motola admitted to Mr. Raia that he had gone to the

2    CYO Board of Directors with a request to halt the Caritas Creek program in late summer of 2006.

3           In mid-January, Teacher/Naturalists reported to camp for training for the upcoming spring

4    season of EEP. They had two portentous meetings, first on January 17 and then on January 19. Oberg

5    Decl., ¶ 5; D. Gordon Decl., ¶ 9.

6           The first meeting involved Caritas Creek staff and representatives from CYO, namely, Dr.

7    Motola, Jennifer Bilyk, Tere Brown, and Steve Grant. Paul Raia was called by Jennifer Bilyk and

8    asked not to attend the meeting, a fact that was withheld by CYO from the Caritas staff when they

9    inquired as to his whereabouts. Dr. Motola presented the staff with a list of approximately twelve

10   changes that he wanted made to the Caritas Creek program. The staff met independently and agreed

11   to all but three of the changes. The three which they could not endorse dropping were the socio-

12   economic mixing of cabin groups and two traditional activities called "Celebration" and

13   "Serendipities," communicative activities through which the campers processed their experiences and

14   shared them with their groups, gaining deeper understand of themselves, each other, and the world.

15   Oberg Decl., ¶ 7; D. Gordon Decl., ¶¶ 11, 12.

16          The staff let the CYO representatives know that, although they may agree to change certain

17   aspects of Celebration and Serendipities, they were not willing to get rid of them altogether. The staff

18   requested more clarity on the desired changes and information concerning what would happen if they

19   did not accept the changes. Oberg Decl., ¶ 8; D. Gordon Decl., ¶ 12.

20          Dr. Motola commented at that meeting that the next year would be very different, with a

21   different program and likely a different name. He said that the environmental education program

22   would probably not be called Caritas Creek, giving the impression to those present that CYO had no

23   interest in continuing its association with the Caritas Creek program or name. Oberg Decl., ¶ 9; D.

24   Gordon Decl., ¶ 13.

25          The staff's questions were answered in the most abrupt fashion in their next meeting, on

26   January 19. In attendance for CCCYO (new name given to CYO) were Dr. Motola, Jennifer Bilyk,

27   Steve Grant, Alexander Lawrence (Human Resources Director for CCCYO), and Executive Director

28   Brian Cahill. Paul Raia was again not included. Mr. Cahill wasted little time before letting the staff

- 8 -

1   know that, due to the staff's unwillingness to compromise, he had to "pull the plug" on Caritas Creek.

2   He stated that the environmental education program would be "re-tooled."  He did not say when camp

3   would reopen.  Oberg Decl., ¶¶ 11, 12; D. Gordon Decl., ¶¶ 15, 16.

4        The staff members, some of whom had returned from working and living on the east coast just

5   that week in preparation for spring session, were immediately handed eviction notices advising that

6   they had the legal minimum of 60 days to move out of staff housing.  They were also provided with

7   two weeks of severance pay.  Oberg Decl., ¶ 13; D. Gordon Decl., ¶ 17; M. Gordon Decl. 14.

8        Tellingly, Dr. Motola spoke specifically about the future of the Caritas Creek programs and

9   name at the January 17th meeting.  His statements to the staff about how different the next year would

10  be and how the program would likely carry a different name than Caritas Creek conveyed to those

11  present that CYO had no interest in continuing to be associated with Caritas Creek.  Dr. Motola then

12  added that he understood that the Caritas Creek staff might not be comfortable with the changes CYO

13  was demanding, and he told them that they had his blessing to go "take your program" somewhere else

14  if that is what they wanted to do.  Staff was left with the message that CYO was to move forward with

15  a new camp program and new camp name.  Oberg Decl., ¶ 14; D. Gordon Decl., ¶ 18.

16       At no time from when Caritas Creek was born in 1975 to when the 2007 spring session was

17  cancelled by CYO did Caritas Creek cease use of the CARITAS CREEK mark or trade name.  At no

18  time did Caritas Creek cease to compensate CYO for its facilities and administrative support.  At no

19  time did Caritas Creek give up sole control of the leadership or programs of Caritas Creek

20  Environmental Education Program.  Caritas Creek was always in control of its mark, ensuring that

21  schools and campers would know what to expect when attending a program carrying the Caritas Creek

22  name.  The staff was so protective of the character of the Caritas Creek program that they were willing

23  to give up their jobs and residences rather than carry on without the defining characteristics of the

24  program. Now CYO wants to take over ownership of that name and use it for a different type of

25  program, a move guaranteed to deceive schools and young people.

26  ///

27  ///

28  ///

III.    **PLAINTIFF CANNOT SHOW LIKELIHOOD OF SUCCESS ON THE MERITS**

To obtain a preliminary injunction, CYO must demonstrate "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir. 1992). The alternatives in the above standard represent "extremes of a single continuum," rather than two separate tests. *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978).

To prove success on the merits, CYO must show success on its claims for federal and state unfair competition. The standard "for Lanham Act unfair competition is the same as that for Lanham Act trademark infringement" and "the elements of state claims for trademark infringement and unfair competition are substantially similar to those of the comparable federal claims." *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1121 (C.D. Cal. 2003).

In its Motion for Preliminary Injunction, to prove success on the merits of its claims, CYO argues that Caritas Creek abandoned its CARITAS CREEK mark through non-use. As shown below, the CARITAS CREEK mark has been in continuous use from 1975, under the supervision, direction, and control of Caritas Creek, and thus, there can be no finding of abandonment through non-use. Further, as the licensee for twenty-two years, CYO is estopped from asserting a trademark action against its licensor Caritas Creek under the doctrine of licensor estoppel.

Thus, CYO cannot show likelihood of success on the merits of its claim, and CYO's Motion for Preliminary Injunction should be denied.

A.    **The Caritas Creek Service Mark Has Never Been Abandoned**

The Lanham Act defines abandonment as (1) discontinuance of trademark use and (2) intent not to resume such use. 15 U.S.C. § 1127. Thus, to prove abandonment of the CARITAS CREEK mark under the Lanham Act, CYO must prove that: 1) the use of the CARITAS CREEK mark has been discontinued and 2) there is no intent to resume such use at a later time. *Id*; *see also Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 936 (9th Cir. 2006). CYO, as the party asserting abandonment, is required to "strictly prove" its claim. *Id.* at 935; *see also Doeblers'*

1    *Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3rd Cir. 2006) ("A party arguing for abandonment

2    has a high burden of proof . . . abandonment, being in the nature of a forfeiture, must be 'strictly

3    proved.'").

4        Here, CYO will not be able to meet its high burden of proof because the CARITAS CREEK

5    mark has been in continuous use from 1975 through the present and there has been, and still remains, a

6    clear intent to continue the use of the mark.

7        **1.    The Caritas Creek Mark Has Been in Systematic and Continuous Use
              Since 1975, and, Therefore, There Can Be No Finding of Non-Use**

8        CYO has argued that Caritas Creek abandoned its Mark through non-use. *See, e.g.*, Plaintiff's

9    Memo at p. 13:4 ". . . or in this case, after a 22-year period of nonuse"; *see also*, p. 14:3 "The 22-year

10   period of nonuse in the present case . . . ." Abandonment through non-use, however, requires

11   complete cessation or discontinuance of trademark use. *See* 15 U.S.C. § 1127; *see also Doeblers' Pa.*

12   *Hybrids, Inc.*, 442 F.3d at 823 (holding that a trademark was not abandoned because "[t]he simple fact

13   is that the use of [the trademark] never ceased."). Any "use" of a trademark, by anyone, defeats an

14   allegation of abandonment. *Electro Source*, 458 F.3d at 936.

15       Here, Plaintiff concedes, as it must, that there has been continuous use of the CARITAS

16   CREEK mark. Specifically, CYO admits that there has been "substantial, exclusive and continuous

17   use" of the mark from 1985 to 2007. *See* Plaintiff's Memo at p. 3:11-13.[1] Hence, by CYO's own

18   admission, there can be no finding of abandonment of non-use.

19       CYO has not cited to any authority where abandonment of non-use can be found despite

20   substantial and continuous use of the mark. Indeed, in the cases relied upon by CYO where

21   abandonment was found, there was an explicit finding of non-use of the mark. For example, in *Rivard*

22   *v. Linville*, the Federal Circuit upheld a finding of abandonment after concluding that there was

23   approximately five years of nonuse of the mark. *Rivard v. Linville*, 133 F.3d 1446 (Fed. Cir. 1998).

24   In *Rivard*, the plaintiff filed a trademark registration for the mark ULTRACUTS in 1986. *Id.* at 1447.

25   _____

26   [1]  Caritas Creek began use of the CARITAS CREEK mark in 1975. Pardini Decl. ¶¶ 4-6. Thus the
         Mark has been in use for approximately 32 years.

27

28

1    In 1991, after five years of non-use of the mark, defendant Linville filed a petition requesting

2    cancellation due to the apparent abandonment of the mark. The Federal Circuit held that the

3    defendant established a prima facie case of abandonment with proof of nonuse for two consecutive

4    years. The approximate "five years of nonuse" was conclusive to support a finding of abandonment.

5    In *Imperial Tobacco Ltd.*, another case cited by CYO, the Federal Circuit affirmed a finding of

6    abandonment because the mark in question was again not in use for over five years. *Imperial Tobacco*

7    *Ltd. v. Philip Morris*, 899 F.2d 1575, 1583 (Fed. Cir. 1990).

8          Even nominal use of a mark is sufficient to defeat a claim of abandonment. For example, in

9    CYO's cited case *Electro Source*, the Ninth Circuit overturned a lower court's ruling of abandonment

10   because there was a "good faith nominal or limited" use of the mark sufficient to defeat a claim of

11   abandonment. *Electro Source*, 458 F.3d at 939.

12         Here, the CARITAS CREEK mark has been in continuous and systematic use from 1975 -- for

13   over 32 years. There simply can be no finding of non-use in this case. Thus, the only way to show

14   abandonment of the mark is for CYO to show that Caritas Creek had a clear intent to relinquish

15   control and ownership of the CARITAS CREEK mark. As the facts below demonstrate, however,

16   CYO cannot meet its high burden because Caritas Creek has always maintained, and continues to

17   maintain, ownership and control of the CARITAS CREEK mark.

18         **2.    The Licensing of the Mark to CYO in 1983 Was Not a "Naked License" --**
              **Caritas Creek Maintained Full Ownership and Control of the Mark After**
19            **the Granting of the License.**

20         CYO has argued that Caritas Creek abandoned the mark by granting a "naked license," and

21   thus Caritas Creek has abandoned any claim of ownership. The facts prove that this is not the case.

22         CYO approached Caritas Creek in 1976 after hearing about the ideas and goals of Caritas

23   Creek. Pardini Decl., ¶ 9. In 1983, the two groups decided to join their resources together and create

24   a working relationship. CYO would provide Caritas Creek with financial support, while Caritas Creek

25   would provide CYO with a much needed environmental education program. Pardini Decl., ¶ 13;

26   Sottile Decl., ¶ 4. To evidence this arrangement, the parties executed an Agreement on September 6,

27   1983. Exhibit 1. This Agreement was accompanied by an Open Letter to CYO from Caritas Creek.

28   Exhibit 2.

Contrary to CYO's assertion, this Agreement did not constitute a "naked license." By the terms of the Agreement, CYO was obliged to provide Caritas Creek with significant supervision, direction, and control, including:

1.      CYO was obliged to operate and maintain the Caritas Creek program according to Caritas Creek's standards;

2.      CYO was obliged to employ Caritas Creek directors to supervise the program;

3.      Caritas Creek directors were fully authorized under the agreement to hire teachers and naturalist staff to operate the EEP;

4.      CYO was obliged to offer "first refusal rights" to former Caritas Creek EEP Directors for any CYO Environmental Education Director positions; and

5.      Caritas Creek was to maintain ownership and control of its Caritas Creek logo and trademark: "<u>Logo --this year we will allow CYO to use our logo for this year Sept. 83-Sept. 84 and must be renewed each year</u>." (Emphasis Added).

Exhibit 1.

As such, this Agreement evidences that Caritas Creek maintained clear supervisory authority over the Caritas Creek EEP, and use of the CARITAS CREEK mark and logo in connection with the EEP, defeating any allegation that this was a "naked license."[2]

Besides the language of the Agreement, the relationship and conduct of Caritas Creek and CYO provides further support that Caritas Creek maintained sufficient control and ownership over the services provided by the Caritas Creek EEP and use of the CARITAS CREEK mark. It was Caritas Creek's understanding from the beginning that the philosophy, direction, and design of the Caritas Creek EEP was to be under its control. Pardini Decl., ¶ 14. Caritas Creek was to continue leadership and control of the Caritas Creek EEP while CYO had no input into the leadership of Caritas Creek EEP. Pardini Decl., ¶¶ 14-15; Sottile Decl., ¶ 7. Further, it was Caritas Creek who recruited schools,

_____

[2]  More to the point is CYO's omission of *any* reference in its moving papers to the Agreement between CYO and Caritas Creek.

1    signed the contracts with schools, scheduled camps, hired and trained staff, designed the program,

2    created new activities, and conducted weekly and seasonal evaluations of the staff and program

3    activities to determine if they were valid and supportive of the core mission. Sottile Decl., ¶ 6. There

4    was never any oversight of the Caritas Creek EEP by CYO. Sottile Decl., ¶ 7. CYO did not attempt

5    to oversee or make suggestions regarding the Caritas Creek EEP. Sottile Decl., ¶ 7. Again, CYO was

6    only involved with financial and legal matters, as CYO did not, nor was allowed to, render any

7    supervision, direction or control over the services of the Caritas Creek EEP. Pardini Decl., ¶¶ 14-15;

8    Sottile Decl., ¶ 7. Contrary to CYO's assertions, Caritas Creek did not sell their name or company to

9    CYO and Caritas Creek's intention from the beginning was always to continue to exist as a group

10   independent from CYO. Sottile Decl., ¶ 5; Olson Decl., ¶ 5-7. This arrangement between Caritas

11   Creek and CYO lasted for many years, with each entity continuing to play its role - Caritas Creek

12   attended to the environmental education programs and the camp, while CYO was involved in financial

13   matters. Pardini Decl., ¶ 16.

14       The symbiotic relationship continued for over a decade but became strained in 1993 as the

15   CYO administrators who made the arrangements with Caritas Creek began to leave the agency and

16   were replaced by new staff. Pardini Decl., ¶ 15. When Caritas Creek joined with CYO, CYO's

17   leadership consisted of Executive Director Mike Marivich and Associate Director Fr. Mike Harriman,

18   each of whom were enthusiastic supporters of the Caritas program. Mike Marivich and Fr. Mike

19   Harriman's positions, however, were later filled by Brian Cahill and Dr. Glen Motola, respectively.

20   These new directors wanted to significantly change the Caritas Creek EEP, but were unable to do so

21   because Caritas Creek maintained the control and ownership of the EEP, not CYO.

22       Thus Caritas Creek's control over the CARITAS CREEK mark, and the underlying Caritas

23   Creek EEP, existed both expressly through the terms of the Agreement and informally through the

24   parties' understanding and practices of operating the EEP. CYO's assertions that "[I]t was Plaintiff,

25   and not Defendants, who exercised supervision and control over the use of the mark and services

26   rendered under the mark after 1985" is plainly false. CYO offers no declaration from Dr. Motola or

27   Mr. Cahill, or from *any* witness, to support its factual assertion.

28   ///

1    Cases with far less control by the licensor have held that there was not a naked license, and

2    hence no abandonment.  In *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001 (9th Cir.

3    1985) (rev'd on other grounds), the Ninth Circuit relied on a combination of factors, including a close

4    relationship between the licensor and licensee, to find adequate control despite the absence of express

5    contractual restrictions.  In *Transgo*, both parties worked together for ten years, during which time

6    they had shared responsibilities -- including product development.  *Id*. at 1017-18.  The licensor

7    manufactured about 90 percent of the underlying goods, occasionally inspected and tested the

8    products, and required the licensee to consult with him regarding any changes in the product.  Based

9    upon this control, the court found no merit in the claim that a naked license had been granted and

10   rejected any allegation that the mark owner had abandoned his mark.  *Id*. at 1018.

11   Like the parties in *Transgo*, Caritas Creek and CYO have had a long term working relationship

12   -- one that spans almost thirty years.  Further, like the licensor in *Transgo*, Caritas required CYO to

13   operate and maintain the underlying service to Caritas's standards.  Indeed, it was only when CYO

14   breached this obligation by demanding a departure from Caritas's overall vision did CYO terminate all

15   Caritas Creek employees.

16   The facts of this case distinguish from the cases where naked licensing was found.  For

17   example, in *Barcamerica International USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir.

18   2002), the Ninth Circuit upheld a lower court's ruling that the licensor engaged in naked licensing of

19   the trademark.  In *Barcamerica*, the licensor never "had any involvement whatsoever regarding the

20   quality of the wine and maintaining it any level."  *Id*. at 597.  Further, the licensor and licensee "did

21   not and do not have the type of close working relationship required to establish adequate quality

22   control . . . No such familiarity of close working relationship ever existed between [them]."  *Id*.  This

23   is inapposite with the facts of this case where Caritas Creek and CYO have had a long term working

24   relationship of almost thirty years and worked closely with each other, as detailed above.

25   CYO's Motion contains no evidence, declaratory or otherwise, to support its position that

26   Caritas Creek granted a naked license.  CYO's reliance on *First Interstate Bancorp. v. Stenquist*, 18

27   USPQ2D 1159 (N.D. Cal. 1990) is misplaced.   First, any reliance on this case in regard to

28   abandonment through naked licensing is improper because the Court's opinion does not address any of

- 15 -

1   the facts or circumstances, or even the agreement, surrounding the naked license.  In *Stenquist*, the

2   Court addressed the granting of summary judgment separate from the abandonment issue.  The only

3   reference to abandonment is the Court's statement that "the issuance of this license <u>without the</u>

4   <u>concomitant exercise of any control over the quality of services</u> offered by Realty constituted a 'naked

5   license'" *Id.* at 1160 (emphasis added).  As noted above, this is not the situation here because Caritas

6   Creek exercised significant, and exclusive, control over the quality of the services offered by Caritas

7   Creek EEP.[3]

8        Lastly, CYO's head director, Dr. Motola, admitted that because he planned to significantly

9   change and "re-tool" the Caritas Creek EEP, CYO would select a new name for the program.  Oberg

10  Decl., ¶¶ 9, 12; D. Gordon Decl.¶¶ 13, 16.  CYO would adopt a different name and not call their new

11  program Caritas Creek because they had no interest in continuing associating themselves with the

12  Caritas Creek EEP or CARITAS CREEK name.  Oberg Decl., ¶ 9; D.Gordon Decl., ¶ 13.

13       The 1983 Agreement merely allowed CYO to use the Caritas Creek name, not control it.  CYO

14  did not, nor was allowed to, render any supervision or control over the services offered by the

15  CARITAS CREEK mark.  CYO's attempt to characterize Caritas Creek's license of its Mark as a

16  naked license lacks factual support, and provides further support that CYO will not succeed on the

17  merits of its claim.

18  **B.    The Doctrine of Licensee Estoppel Will Also Preclude CYO From Succeeding on the Merits of the Claim**

19       The doctrine of licensee estoppel will further prevent CYO from meeting its high burden of

20  proving likelihood of success on the merits of the case.  The doctrine of licensee estoppel provides that

21  a licensee cannot sue its licensor for trademark infringement.  4 J. Thomas McCarthy, *McCarthy on*

22  *Trademarks and Unfair Competition* § 18:63 (4th ed. 2007).  Because a trademark license is simply

23

24  _____

25  [3]  CYO has also argued that the Caritas Creek corporation went out of business after ceasing
    operations in 1985.  *See* Plaintiff's Memo at p. 4:16-17.  The corporate status of Caritas Creek is

26  irrelevant to the issue of control and ownership of the mark.  As discussed, the staff of Caritas
    Creek, not CYO, ran the Caritas Creek EEP and controlled the nature and quality of the services

27  offered and provided under the CARITAS CREEK mark associated with it.

28

1  "permission" to use the mark or name granted by the owner to the licensee and use of the mark by the

2  licensee inures only to the benefit of the licensor, the licensee neither creates nor retains any

3  independent right to the mark on account of the license. *Printers Services Co. v. Printer Services*

4  *Company*, 1991 U.S. Dist. LEXIS 20561, *13-14 (C.D. Cal. 1991). As such, it is a long settled

5  principle of law that a licensee of a trademark or trade name may not set up any adverse claim in it as

6  against its licensor. *Pacific Supply Cooperative v. Farmers Union Cent. Exchange, Inc.*, 318 F.2d

7  894, 908 (9th Cir. 1963).

8        Here, the Agreement between Caritas Creek and CYO provided for a one-year license from

9  September 1983 through 1984, to be renewed each year. Exhibit 1. Though there was no formal

10  renewal made after 1984, due to the facts and circumstances described above, an implied license came

11  into effect and existed up until January 2007, when CYO terminated the Caritas Creek employees. "It

12  is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license.

13  The test for whether or not an implied license existed is based solely on the objective conduct of the

14  parties." *Villanova University v. Villanova Alumni Educational Foundation, Inc.*, 123 F. Supp. 2d 293

15  (E.D. Pa. 2000).[4]

16        Further, a licensee's use inures to the benefit of the licensor-owner of the mark and the licensee

17  acquires no ownership rights in the mark itself. *McCarthy, supra,* at §18.46. This is the rule at

18  common law and has been codified in Lanham Act § 5. *Id.* Thus, any use of the CARITAS CREEK

19  mark by CYO inured to Caritas Creek's benefit by law. Thus, CYO is estopped as a matter of law

20  from asserting unfair competition claims against its licensor arising from actions during the term of

21  the license (i.e., September 1983 to January 2007).

22

23

24

25  _____
[4]  Because CYO is no longer the licensee of the CARITAS CREEK mark, CYO has no right to use
26       the CARITAS CREEK mark. Thus, Caritas Creek, as its rightful owner, has concurrently brought
         its own action of trademark infringement against CYO. *See* Caritas Creek's Answer and
27       Counterclaim.

28

1     **IV.  AN INJUNCTION WILL CAUSE HARM TO THE PUBLIC INTEREST BECAUSE OF**
2          **THE LIKELIHOOD OF CONFUSION**

3        CYO is asking that the Court enjoin Caritas Creek from any use of the CARITAS CREEK

4 mark "in connection with environmental education and summer camp programs" and to remove the

5 term CARITAS CREEK from "all premises, facilities, websites and other objections [sic], places and

6 things owned or controlled" by Caritas Creek. *See* CYO's Proposed Order.

7        If the Court were to grant such an injunction, the Caritas Creek EEP and its underlying Mark

8 will be operated, for the first time, by CYO.  CYO's proposed changes to the Caritas Creek program

9 are so flawed that any association with the name Caritas Creek and/or the Caritas logo would be

10 detrimental to the public's expectation from the program.  "Caritas Creek" stands for something

11 specific to these schools and families, and it would be misleading for CYO to offer a different

12 environmental education experience under the Caritas Creek name.  Pardini Decl., ¶ 26.  This is why

13 the founding members of Caritas partnered with some current staff members to move the Caritas

14 Creek programs to a new home.

15        The reputation of Caritas Creek EEP is based on the unique character and leadership of the

16 camp  Pardini Decl., ¶ 24.  Many of the original founders have never ceased devoting their time and

17 ideas to the development and evolution of Caritas Creek.  Pardini Decl., ¶ 25.  Throughout the years,

18 these members and staff have stayed invested in Caritas Creek and have contributed time, effort,

19 inspiration, and validation to the program and the personnel.  Pardini Decl., ¶ 25.  Those involved with

20 Caritas Creek understood that the program and personnel remained under the leadership of Caritas

21 Creek, while CYO offered financial and legal support.  Pardini Decl., ¶ 25.

22        Caritas Creek has impacted thousands of young lives, campers and staff alike.  Pardini Decl.,

23 26.  Many young people's sense of who they are and the value system they have adopted were

24 nurtured at Caritas Creek camps.  D. Gordon Decl. ¶ 5.  Caritas Creek staff has been asked countless

25 times by former campers for such things as advice on college and career prospects to being

26 Confirmation sponsors and godparents to their children.  Pardini Decl., ¶ 26.  "Caritas Creek" has

27 acquired a distinct meaning in the community, and it would be misleading for CYO to offer a different

28 environmental education experience under the Caritas Creek name.  Pardini Decl., ¶ 26.

- 18 -

1    Generally, the plaintiff in a trademark action needs to prove a likelihood of confusion to

2  succeed on the merits of its claim.  Here, however, Caritas Creek has shown that the public will not

3  only be confused, but deceived, if they were to enroll in the Caritas Creek EEP, if it were under CYO's

4  control.  In fact, CYO's director acknowledged this.  On January 19, 2007, CYO's directors, Dr.

5  Motola, Mr. Cahill and others, explicitly told the Caritas Creek staff that due to the staff's

6  unwillingness to compromise, he had to "pull the plug" on Caritas Creek and the Caritas Creek EEP.

7  D. Gordon Decl., ¶¶ 13, 16; Oberg Decl., ¶¶ 9, 12.  Dr. Motola spoke specifically about the Caritas

8  Creek name, stating that a new program would likely be run under a different name to differentiate

9  CYO's new program with the existing Caritas Creek EEP.  D. Gordon Decl., ¶¶ 13, 16; Oberg Decl.,

10  ¶¶ 9, 12.  He told the staff they had his blessing to go "take your program" somewhere else if that is

11  what they wanted to do.  Oberg Decl., ¶ 14; D. Gordon Decl., ¶ 18.  Caritas Creek was given the

12  impression that CYO had no interest in continuing to be associated with the CARITAS CREEK mark.

13  CYO was to move forward with a new camp program and new camp name.  D. Gordon Decl., ¶¶ 13,

14  16; Oberg Decl., ¶¶ 9, 12.

15    The Caritas Creek staff was so protective of the character of the Caritas Creek EEP that they

16  were willing to give up their jobs and residences rather than carry on without the defining

17  characteristics of the program.  Now CYO wants to take over ownership of that name and use it for a

18  different type of program, a move guaranteed to deceive schools and young people.

19    Caritas Creek requests that the Court deny CYO's Motion based upon the harm to the public

20  interest should an injunction occur.

21  **V.    CYO WILL NOT SUFFER IRREPARABLE HARM SHOULD THE COURT DENY**
    **THE INJUNCTION**
22

23    It cannot be argued that CYO will suffer irreparable harm if the Court does not issue the

24  injunction.  First CYO has presented no evidence, either declaratory or otherwise, to demonstrate that

25  CYO will suffer irreparable harm should the Court not grant the injunction.

26    Second, and more importantly, Caritas Creek is a small organization whose lifeblood is

27  dedicated to the Caritas Creek EEP.  Should an injunction occur, Caritas Creek could not continue to

28  operate its EEP, and would be forced to shut down, after more than 30 years of community service to

- 19 -

1    the public.  Many of the original founders have never ceased devoting their time and ideas to the

2    development and evolution of Caritas Creek.  Pardini Decl., ¶ 25.  Throughout the years, these

3    members and staff have stayed invested in Caritas Creek and have contributed time, effort, inspiration,

4    and validation to the program and the personnel.  Pardini Decl., ¶ 25.  Caritas Creek has impacted

5    thousands of young lives, campers and staff alike.  Many young people's sense of who they are and

6    the value system they have adopted were nurtured at Caritas Creek camps.  Caritas Creek staff has

7    been asked countless times by former campers for such things as advice on college and career

8    prospects to being Confirmation sponsors and godparents to their children.  Pardini Decl., ¶ 26.

9          Caritas Creek should not be required to sut down when it invested the time developing the

10   Caritas Creek EEP.  This holds especially true when the director of CYO indicated that they would

11   like to "re-tool" and rename the program.  D. Gordon Decl., ¶¶ 16, 18.In or around January 2007,

12   when Dr. Motola, the newest program director of CYO, tried to impose major changes, the Caritas

13   Creek resisted, the entire staff, some 31 or 32 persons were summarily fired and those living on the

14   premises were evicted.  Caritas Creek would now like to continue the Caritas Creek EEP at a new site,

15   and CYO would be free to develop their own new EEP, but should not be allowed to use the Caritas

16   Creek name.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 07-2658 SI

## VI.    CONCLUSION

"Caritas Creek" stands for something specific to the local schools and families, and it would be misleading for CYO to offer a different environmental education experience under the CARITAS CREEK mark. Caritas Creek was the first user of the mark and has always maintained control and ownership of the mark throughout. Caritas Creek, not CYO, is the rightfully owner of the CARITAS CREEK mark. CYO will not succeed on the merits of its claim and injunction will cause harm to the public interest, and irreparably harm Caritas Creek, effectively shutting down its program. CYO's Motion for Preliminary Injunction should be denied.

DATED: July 27, 2007                    Respectfully submitted,

By: _Judith M. Schvimmer_
PAUL VAPNEK
JOHN E. LORD
JUDITH M. SCHVIMMER
TOWNSEND AND TOWNSEND AND CREW LLP

Attorneys for Defendants
MARY M. GORDON, ERIK "WITAKAE" OBERG,
EMILY WOOD ORDWAY, PAULA PARDINI, and
CARITAS CREEK

61108905 v1

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C 07-2658 SI