MATTHEW F. MILLER (State Bar No. 172661)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
One Montgomery Street, Suite 2200
San Francisco, CA 94104-5501
Telephone: (415) 364-6700
Fax: (415) 364-6785
Email: mmiller@schnader.com

BRUCE A. McDONALD, *pro hac vice*
**SCHNADER HARRISON SEGAL & LEWIS LLP**
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 2006
Telephone: (202) 419-4235
Fax: (202) 419-3454
Email: bmcdonald@schnader.com

Attorneys for Plaintiff **CATHOLIC CHARITIES CYO**

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CATHOLIC CHARITIES CYO,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARY W. GORDON,** *et al.*,<br><br>Defendants. | Case No. C 07-02658 SI<br><br>**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**DATE:** August 17, 2007<br>**TIME:** 9:00 a.m.<br>**DEPT:** Courtroom 10, 19th Floor<br>**JUDGE:** The Honorable Susan Illston |

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL REBUTTAL ..... 2

A. Background ..... 2

B. Termination of Defendants' Employment ..... 4

1. Paula Pardini ..... 4

2. Remaining Defendants ..... 5

C. Defendants' "Contemporaneous Documents" ..... 5

III. ARGUMENT ..... 6

A. Likelihood of Success ..... 6

1. Plaintiff Acquired the "Caritas Creek" Service Mark in 1983 When Defendants Presented the Program to Plaintiff and Became Employees of Plaintiff. ..... 7

2. Defendants' Unsigned 1983 Document is Inadmissible Under the California Statute of Frauds. ..... 8

3. If Admissible, the 1983 Document Supports Plaintiff's Case. ..... 9

4. Even if Defendants Controlled Aspects of Their Own Use of the "Caritas Creek" Service Mark After 1983, They Did Not Control Plaintiff's Use of the Mark. ..... 11

5. Defendants' California Corporation Went Out of Existence in 1987 ..... 12

6. Estoppel ..... 12

B. The Public Interest ..... 14

C. Irreparable Harm ..... 14

IV. CONCLUSION ..... 15


LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.E. Hoss v. Purinton*, 229 F.2d 104 (9th Cir. 1955) .......... 12

*Barcamerica International USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002) .......... 9

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) .......... 13

*First Interstate Bancorp. v. Stenquist*, 18 USPQ2d 1159 (N.D.Cal. 1990) .......... 9

*Halo Management, LLC v. Interland, Inc.*, 76 USPQ2d 1199 (N.D.Cal. 2004) .......... 9

*Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637 (9th Cir. 1993) .......... 14

*Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838 (9th Cir. 1969) .......... 7

*Schick Services, Inc. v. Jones*, 173 F.2d 969 (9th Cir. 1949) .......... 8

*United States v. Bennett*, 363 F.3d 947 (9th Cir. 2004) .......... 8

*Vision Sports Inc. v. Melville Corp.*, 888 F.2d 609 (9th Cir. 1989) .......... 14

*Western Chance No. 2, Inc. v. KFC Corp.*, 957 F.2d 1538 (9th Cir. 1992) .......... 8

## STATE CASES

*Iskenderian v. Iskenderian*, 144 Cal. App. 4th 1162 (2006) .......... 7

## STATUTES

Cal. Civ. Code § 1624(a)(1) .......... 8

California Corporations Code, §§ 5000 - 6910 .......... 12

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

Fed.R.Evid. 1004 ....................................................................................................8

**OTHER AUTHORITIES**

Callman on Unfair Competition, Trademarks and Monopolies (4th ed., May 2003 update) ........................................................................7,8

John D. Calamari & Joseph M. Perillo, Contracts (3d ed. 1987) ......................................8

2 McCarthy on Trademarks and Unfair Competition (4th ed., 1992) ..................................7

LAW OFFICES OF SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

## I. INTRODUCTION

Plaintiff's motion for preliminary injunction should be granted because Defendants' evidence, viewed most favorably to Defendants, fails to rebut the fact that Plaintiff is the owner of the "Caritas Creek" service mark. Plaintiff acquired the Caritas Creek program in 1983 from the defendant corporation in exchange for forgiveness of the program's escalating debt and an agreement to employ the program's then leaders. From that time forward, Plaintiff was the owner of the commercial enterprise known as "Caritas Creek" and consistently advised the public of its ownership and operation of what would become a renowned program. Over the following 24 years Plaintiff invested millions of dollars in development, dramatic expansion and operation of the program. The individuals previously associated with the Defendant California corporation, including Defendant Paula Pardini, became Plaintiff's employees in 1983. The Caritas Creek corporation itself went out of existence in 1987.[1] Plaintiff terminated Ms. Pardini in 2000. By January 2007, none of Caritas Creek employees hired by Plaintiff in 1983 remained employed by Plaintiff.

While the parties differ about the reasons that led to Plaintiff's termination of Defendants' employment, none of the Defendants' evidence rebuts the fact that Plaintiff terminated those employees in its capacity as the owner of the Caritas Creek commercial enterprise. These facts alone are sufficient to establish that Plaintiff exercised the supervision and control inherent in its capacity as owner of the "Caritas Creek" service mark.

It is further undisputed that Defendants are using the name in competition with Plaintiff, raising a presumption of irreparable injury.[2] In turn, the actual confusion resulting from such continued usage is damaging to the public interest.[3] While the history of Defendants' employment shows that Plaintiff owns the "Caritas Creek" service mark, understanding the

---

[1] See certified records of California Secretary of State appended hereto as Exhibit A.

[2] For example, on Monday, July 9, 2007, Defendant Erik Witakae appeared at the entrance to Plaintiff's facility on the first day of Plaintiff's summer camp session dressed in a "Caritas Creek" shirt, holding a clip board and drawing attention to himself as if to impersonate one of Plaintiff's administrative staff. See Declaration of Michael J. Ward, filed herewith.

[3] Multiple instances of actual confusion resulting from Defendants' continuing use of the "Caritas Creek" name are documented in the Declaration of Colleen McCarthy (hereafter "McCarthy Decl."), filed herewith.

LAW OFFICES OF SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

damage to Plaintiff and the public resulting from Defendants' continued use of the mark requires an examination of the dispute that led to the termination of Defendants' employment. The reasons that led Plaintiff to exercise its authority as owner of the Caritas Creek program are irrelevant to Plaintiff's ownership of the mark; all that matters for purposes of that inquiry is that Plaintiff possessed such authority and exercised it. However, Defendants have introduced statements regarding the circumstances that led to their termination which go to the equities of the relief requested by Plaintiff and the public interest in avoiding confusion between the parties. As Defendants' statements fail to disclose the real reasons that led to this dispute, or the reasons why confusion between the parties is especially damaging to the public, those circumstances must now be clarified.

## II. FACTUAL REBUTTAL

### A. Background

Plaintiff agrees with Defendants' description of the Caritas Creek program as a "unique environmental education and camping experience" founded by some of the defendants prior to Plaintiff's 1983 acquisition of the program. However, the majority of representations in Defendants' statement of facts concern issues irrelevant to Plaintiff's acquisition and subsequent exercise of control over the program, i.e., the primary factual issues in this case.

A March 1998 "CYO Organizational Study" describes Caritas Creek as a former "stand-alone corporation" and one of the "various programs *merged into* the Catholic Youth Organization." *See* Declaration of Brian Cahill (hereafter "Cahill Decl."), filed herewith, ¶3, Exh. M at p. 2 [emphasis supplied.][4] The report also documents the growth achieved by the

[4] The author of the 1998 study, Father David Ghiorso, served as Plaintiff's associate director from 1985-1995 and Executive Director from 1995-1999. Declaration of David A. Ghiorso (hereafter "Ghiorso Decl."), filed herewith, ¶1. Father Ghiorso believed that Plaintiff acquired ownership of Caritas Creek in 1983 for forgiveness of its debt to Plaintiff. *Id.*, ¶ 3. At all times during Father Ghiorso's tenure with Plaintiff, the latter had "full fiscal, administrative and programmatic responsibility for the Caritas Creek program, just as it did for the variety of other existent CYO programs." *Id.*, ¶ 4.



LAW OFFICES OF SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

program resulting from Plaintiff's acquisition and multi-million-dollar investment in the program. *Id.* at 13. So, too, the 1991 Caritas Creek Teacher/Naturalist Manual states clearly "In the summer of 1983 Caritas Creek merged with the Catholic Youth Organization . . ." *Id.*, Exh. A at p. i.

While Plaintiff accorded a degree of independence to Defendants in the administration of the Caritas Creek program over the years, Plaintiff's internal reports and external communications contradict Defendants' contention that Plaintiffs lacked ultimate operational, programmatic, and administrative control over the program.

A Caritas Creek request for funding during Ms. Pardini's tenure states: "CYO Caritas Creek is parented by the Catholic Youth Organization which provides full fiscal and programmatic oversight and responsibility for the program." Cahill Decl., Exh. B, at p. 4.

At all times after 1983, public written communications on behalf of the Caritas Creek program identified Caritas Creek as a program of Catholic Charities CYO. Typical of such communications was a grant application submitted by Plaintiff's employee Paul Raia, then director of CYO Outdoor Programs including the Caritas Creek program. Cahill Decl., Exh. L. The application begins as follows:

> Organization Name: Catholic Charities CYO
> Address: 180 Howard Street, Suite 100, San Francisco, CA 94105-1617[5]
> Contact Name: Paul Raia
> Contact E-mail: praia@cccyo.org[6]
> Organization Web site: cccyo.org[7]
> Program/Project Title: Caritas Creek Environmental Education Program

In response to the question, "Is your organization a 501c3?" the letter states "Yes. Please see attached letter." *Id.* The attached letter from Brian Cahill makes it clear that the term "your

---

5 Plaintiff's corporate address.
6 Plaintiff's e-mail address.
7 Plaintiff's website.



LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

organization" in the preceding question is Catholic Charities CYO, not Caritas Creek, and that Caritas Creek is a program of Catholic Charities CYO. *Id.*

Another public program report highlights the interdependence of CYO Summer Camp and Caritas Creek as the two primary components of CYO Outdoor Programs:

> While distinct in terms of months of operation, CYO Summer Camp and Caritas Creek Environmental Education work hand-in-hand to provide year-round recreation, leadership development, and learning opportunities for youth. CYO Outdoor Programs employ a core group of ongoing, year-round staff to run the summer and school-year programs. Philosophically the two programs are intertwined and the curriculum of each is designed to reinforce each other. Forty percent of students who attend summer camp participate in Caritas Creek during the school year.

Cahill Decl., Exh. G.

Finally, an unbroken string of CCCYO Associate Directors and Executive Directors from 1983 to the present attest to the fact that at all times after 1983, CCCYO possessed full fiscal, administrative and programmatic responsibility for its Caritas Creek program. See Declaration of Michael A. Harriman (hereafter "Harriman Decl."), filed herewith, ¶8; Ghiorso Decl., ¶4; Cahill Decl., ¶¶4-7.

**B. Termination of Defendants' Employment**

Out of respect for the individual Defendants, Plaintiff would have declined to discuss in greater detail the circumstances leading to the termination of Defendants' employment. However, Defendants have introduced statements going to the relationship of the parties that do not accurately reflect the control that Plaintiff exercised in its role as the owner of the Caritas Creek program, or the damage to Plaintiff and the public that will result from continuing confusion about the affiliation between the parties.

**1. Paula Pardini**

The issues leading to the termination of Defendant Pardini, then director of CYO Outdoor Programs, including the CYO Caritas Creek program, are reflected in a memorandum from Mr. Cahill to Ms. Pardini dated November 23, 1999. Cahill Decl., Group Exh. D. They included Defendants' hiring of individuals with criminal backgrounds as counselors and staff members, as

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

LAW OFFICES OF SCHNADER HARRISON SEGAL & LEWIS LLP ONE MONTGOMERY STREET, SUITE 2200 SAN FRANCISCO, CA 94104-5501 (415) 364-6700

well as the hiring of individuals terminated by other programs. They also involved problems resulting from staff cohabitation, parties, and alcohol consumption on CYO property. *Id.*

The supervision and control repeatedly exercised by Plaintiff over Defendant Pardini and the entire Caritas Creek program are again evident in (1) a February 7, 2000 memorandum from Mr. Cahill to Ms. Pardini, attaching a list of norms and policies to be followed by the Caritas Creek program (*Id.*), (2) a February 17, 2000 memorandum from Mr. Cahill to Ms. Pardini involving inappropriate personal expenses (*Id.*); and (3) a February 18, 2000 memorandum from Mr. Cahill to Ms. Pardini regarding numerous administrative, budgetary and staffing issues. *Id.* These problems culminated in Ms. Pardini's March 17, 2000 termination as evidenced by a letter of the same date from Mr. Cahill to Defendant Pardini. *See* Cahill Decl., ¶9, Exh. C.

**2. Remaining Defendants**

Problems involving the maintenance of standards and control in the administration of the Caritas Creek program and its staff continued after termination of Defendant Pardini's employment in 2000 and as reflected in a January 5, 2005 letter of complaint from the parents of two seventh-graders. The letter discusses in detail various sexually inappropriate comments and other objectionable conduct by one of the Caritas Creek cabin leaders and the failure of the Caritas Creek staff to terminate that employee after the conduct came to light. Cahill Decl., Exh. E.[8]

The breakdown in relations between the parties arose largely from Plaintiff's efforts to institute administrative and programmatic reforms designed for the health and safety of campers and staff, Defendants' refusal to comply with Plaintiff's reforms, and Plaintiff's exercise of ultimate supervision and control in terminating Defendants' employment in January 2007. Cahill Decl., ¶¶14-17; Declaration of Glenn Motola (hereafter "Motola Decl.") filed herewith, ¶3.

**C. Defendants' "Contemporaneous Documents"**

Defendants rest their case on two "contemporaneous documents": one is an unsigned draft document dated September 6, 1983 and the other is an undated and unsigned "open letter"

---

8 In the Court filing, Plaintiff has redacted the identity of both the parents and the subject employee to protect their privacy. Plaintiff will provide an unredacted copy of the letter to Defendants and the Court upon request.

without addressee or proof of delivery. *See* Defendant's Answer and Counterclaims, Exhibits 1 and 2. Monsignor Michael Harriman, who was then Director of Plaintiff's Occidental facility, recalls that he did not sign the former 1983 draft document. Harriman Decl., ¶ 4. He in fact recalls scratching out the proposed name of the program, "Caritas – CYO Environmental Education program," (or authorizing that action to be taken), and changing the name to "CYO-Caritas Environmental Education program." He did this to make clear to Defendants that the Caritas Creek program "was to be under the ownership and direction of CYO." *Id.,* ¶¶4-5. At the bottom of the unsigned document is a handwritten, barely legible inscription that reads:

> Logo – This year we will allow CYO to use our logo for this year Sept. 83 – Sept. 84 and must be renewed each year.

Father Harriman does not recall seeing this handwritten note and attests that, had he seen it, he "would have directed Caritas Creek to remove this language because it contradicts the fact that CYO was assuming ownership and operation of the Caritas Creek program including the logo." *Id.,* ¶ 7. Notably, Defendants admit that this annual logo renewal never occurred. Defendants' brief at 17:8-10.

Defendants' second "contemporaneous document," the "open letter to CYO from Caritas Creek," is not signed, dated or addressed. Defendants do not even contend that Plaintiff was intended to be bound or in any way affected by the various "goals" contained in the "open letter." The shaky (and Plaintiff asserts nonexistent) underpinnings of Defendants' case represented by these two inadmissible documents could not be more self-evident.

## III. ARGUMENT

### A. Likelihood of Success

On the merits, Plaintiff owns the "Caritas Creek" service mark, not because of any unsigned documents, but because Plaintiff owns the commercial enterprise identified by the mark. The issue is not whether the *service mark* was abandoned, but whether Defendants in 1983 and thereafter abandoned their *ownership* of the mark in favor of Plaintiff when they accepted employment by Plaintiff and "present[ed]" the "Caritas Creek" program to Plaintiff in exchange for valuable consideration. The September 1983 draft document appears never to have

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

been signed by Plaintiff and is therefore inadmissible under the California statute of frauds. The logo "renewal" handwriting actually supports Plaintiff's position because Defendants never performed an annual renewal.

Moreover, regardless of whatever subjective intent Defendants or their predecessors may have had in 1983 about their future supervision and control of the "Caritas Creek" program, Plaintiff's termination of Paula Pardini shows that any such aspirations were abandoned by Defendants no later than March 2000. It is Defendants, therefore, and not Plaintiff, who are estopped from asserting that they possessed any ultimate control of the Caritas Creek program, having failed to contest Plaintiff's exercise of that control either before or after March 2000.

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

### 1. Plaintiff Acquired the "Caritas Creek" Service Mark in 1983 When Defendants Presented the Program to Plaintiff and Became Employees of Plaintiff.

A trademark cannot exist independently from the goodwill to which it relates. *Mister Donut of America, Inc. v. Mr. Donut, Inc.,* 418 F.2d 838, 842 (9th Cir. 1969). Therefore, a common law trademark "will follow an assignment of the goodwill and pass under a general conveyance of . . . a business, even though it is not specifically designated in the assignment." *Iskenderian v. Iskenderian,* 144 Cal. App. 4th 1162, 1169 (2006) (quoting Callman on Unfair Competition, Trademarks and Monopolies (4th ed., May 2003 update) § 20:63, p. 20-539).

Because a trademark is a symbol of goodwill, and has no independent significance apart from the goodwill it symbolizes, the law requires "that good will always go with the trademark..." 2 McCarthy on Trademarks and Unfair Competition (4th ed., 1992) § 18:3 (hereinafter "McCarthy"). Thus, the ownership of a business "necessarily includes the goodwill of the business, and it is well settled that a trademark is merely a symbol of goodwill" associated with that business. *Iskenderian,* 144 Cal. App. 4th at 1169. "Good will and its trademark symbol are as inseparable as Siamese Twins who cannot be separated without death to both." *Id.* (quoting McCarthy, § 18:2, p. 18-6 (release No. 38, Sept., 2006)). To suggest, therefore, that Plaintiff's acquisition of the Caritas Creek program in 1983 did not include the goodwill of the

associated commercial enterprise - and necessarily the trademark that symbolizes that goodwill - is "contrary to both common sense and the law." *Iskenderian, id.* (citing Callmann at p. 20-539).

**2. Defendants' Unsigned 1983 Document is Inadmissible Under the California Statute of Frauds.**

Defendants' 1983 document inscribed with a handwritten notation purporting to license the "Caritas Creek" "logo" to Plaintiff is inadmissible under the California statute of frauds. The statute provides that an agreement which, by its terms, is not to be performed within a year from the making, is invalid unless the contract, or some memorandum thereof, is in writing and subscribed by the party to be charged. Cal. Civ. Code § 1624(a)(1). Here, Defendants do not even make any assertion that this "agreement" was ever signed. The Ninth Circuit has held that the statute of frauds is applicable to an intellectual property license, *Schick Services, Inc. v. Jones,* 173 F.2d 969, 977 (9th Cir. 1949). Even construed narrowly, the statute is applicable to the 1983 writing because the latter calls for renewal on an annual basis and is incapable of being performed within a year under any interpretation. *Western Chance No. 2, Inc. v. KFC Corp.,* 957 F.2d 1538, 1541 (9th Cir. 1992) (citing John D. Calamari & Joseph M. Perillo, Contracts § 19-17 (3d ed. 1987)).

Nor is the 1983 document admissible under the "best evidence rule." Rule 1002 of the Federal Rules of Evidence provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." *See generally United States v. Bennett,* 363 F.3d 947 (9th Cir. 2004). While Fed.R.Evid. 1004 would provide for the admissibility of the unsigned copy if the original had been lost or destroyed, Defendants have offered no evidence that the original document was ever signed, let alone that it was lost or destroyed. On the contrary, the officer of Plaintiff who recalls reviewing the draft document and making changes to it swears that he never signed it *because of the very language upon which Defendants hinge their "license" theory.* Harriman Decl., ¶¶4, 5, 7.

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

**3. If Admissible, the 1983 Document Supports Plaintiff's Case.**

The 1983 document, even if admissible, supports Plaintiff's position that Defendants abandoned their claim of ownership in the "Caritas Creek" service mark by failing to supervise and control Plaintiff's use of the mark at any time after 1983. The handwritten notation references an annual renewal of Plaintiff's use of Defendants' logo. Defendants admit that this renewal never occurred. Defendants' brief at 17:8-10. This admission supports Plaintiff's contention that Defendants never exercised the supervision and control over Plaintiff's use of the "Caritas Creek" trademark that would have been essential to the preservation of Defendants' claim of ownership in the mark. Aside from Defendants' silence on Plaintiff's unfettered use of the Caritas Creek **logo**, Defendants submit no evidence whatsoever that they exercised any control over Plaintiff's 24 years of uninterrupted use and advertisement of the CYO Caritas Creek program **name**.

Any alleged "license," therefore, would have been a classic "naked license." *See Barcamerica International USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002);[9] *Halo Management, LLC v. Interland, Inc.*, 76 USPQ2d 1199, 64 Fed.R.Evid. Serv. 1077 (N.D.Cal. 2004);[10] *First Interstate Bancorp. v. Stenquist*, 18 USPQ2d 1159 (N.D.Cal. 1990).

Defendants contend that the 1983 document could not constitute a "naked license" because it obligated Plaintiff to offer "first refusal rights" to Caritas Creek's then Directors and allow those directors to maintain Caritas Creek's standards. Defendants' brief at 13.

---

9 In *Barcamerica,* the Ninth Circuit affirmed a district court finding that a trademark owner abandoned its mark by engaging in naked licensing without any control over the quality of goods produced by its licensee, where the licensor failed to make even a minimal effort by annual sampling of an adequate number of wine bottles to ensure that its licensee's wines bearing its mark were of sufficient quality to retain the mark.

10 In *Halo Management,* the court held that the plaintiff abandoned its mark by entering into a "naked license," exactly like the alleged license in this case, under which the plaintiff retained no express contractual right to inspect or supervise the licensee's conduct. The plaintiff's quality control efforts in *Halo Management* consisted of little more than a short series of requests to review unspecified products and material. Even that is more than what occurred in the present case. The court in *Halo Management* held that such transparent *post hoc* gestures were not sufficient to revive an abandoned mark, nor did they function as adequate "quality controls."

Defendants fail to appreciate that these "obligations" of CCCYO were exactly what Plaintiff desired by acquiring the Caritas Creek program, i.e., to acquire a fully functioning and well maintained outdoor environmental education program operating under the standards which CCCYO had witnessed during the several years during which the Caritas Creek program rented the Occidental facility. It is also why Plaintiff required that Caritas Creek "present to CYO" the former's complete environmental education file system, its expert knowledge in operations of the program, past and present personnel records, and Caritas Creek's current and prospective client lists. *See* Exhibit 1 to Defendants' Answer and Counterclaims. The fact that Plaintiff demanded a "soup to nuts" environmental education program demonstrates the fact that Defendants turned over their turnkey program to Plaintiff who then became the owner and operator of this "new program."[11]

Defendants further rebut Plaintiff's "naked license" argument by extolling the fact that the Caritas Creek staff "recruited schools, signed the contracts with schools, scheduled camps, hired and trained staff, designed the program, created new activities, and conducted weekly and seasonal evaluation of the staff and program activities . . ." Defendants' brief at 13:24-14:3. Again, Defendants miss the point that, rather than demonstrating Plaintiff's lack of control over the Caritas Creek program, these functions were the assigned job duties for which Plaintiff employed the Caritas Creek staff. *See* Cahill Decl., ¶6, 9 and Exh. B under section titled "Staff and Volunteer Responsibilities"; Ghiorso Decl., ¶5. Failure to perform these duties would subject the Caritas Creek staff to termination. *Id.* Indeed, the various memoranda from Brian Cahill to Defendants' founder Paula Pardini leading to her March 17, 2007 termination

[11] Monsignor Harriman points out in his declaration that the sentence in the 1983 document stating: "Therefore, it is agreed that the new program will be known as CYO-Caritas Environmental Education program" signifies that Plaintiff was in fact acquiring a "new program," not merely a continuation of the Caritas Creek program that had existed to date. Harriman Decl., ¶4. He goes on to explain that the strike-out of the originally drafted program title "Caritas-CYO Environmental Education program" in favor of the name "CYO-Caritas Environmental Education program" was intended to make clear to the Caritas Creek representatives that its program was to be under the ownership and direction of CYO and its name there must reflect that fact. *Id.*, ¶5.

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

completely discredit Defendants' contention of any ultimate control and supervision of the Caritas Creek program. *See* Cahill Decl., ¶9 and group Exh. D.

Accordingly, Defendants' rebuttal of Plaintiff's "naked license" position merely calls attention to the facts that CCCYO demanded certain duties and standards to be upheld by its Caritas Creek program employees and, when those standards and responsibilities were violated, CCCYO exercised ultimate control over its program.

**4. Even if Defendants Controlled Aspects of Their Own Use of the "Caritas Creek" Service Mark After 1983, They Did Not Control Plaintiff's Use of the Mark.**

As discussed above, Defendants would have the Court understand that they retained ownership of the "Caritas Creek" service mark after 1983 because they continued to exercise a degree of control over their own job duties. Defendants' brief at 9:18-22; 13:24-14:3. Putting aside all of Plaintiff's evidence to the contrary, allowing for the difference between the parties over the issue of whether and to what extent the Defendants' activities were subject to Plaintiff's supervision and control, and taking all of Defendants unsupported statements on that issue in a light most favorable to Defendants, the evidence is nevertheless undisputed that, after 1983, the Defendants never possessed or exercised any control over *Plaintiff's use* of the "Caritas Creek" service mark.

There is simply no evidence in the record to suggest that Plaintiff used the "Caritas Creek" mark after 1983 under *any* license agreement with Defendants. In contrast, Plaintiff has demonstrated in numerous affidavits that it possessed and exercised ultimate control over all relevant facets of its Caritas Creek program. *See* Cahill Decl., ¶¶4-9, 15-18; Harriman Decl., ¶¶5, 8-9; Ghiorso Decl., ¶¶4-5. Any "license agreement," had it ever existed, was "naked" in the scantiest sense of the word. In reality, the "license" never existed and is a contrivance set up by Defendants to divest Plaintiff of its ownership in a service mark that Plaintiff spent millions of dollars developing over 24 years. Nor is that "license" the only contrivance set up by Defendants in this case, considering the appearance that Defendants have sought to construct by reinstating the defendant corporation "Caritas Creek" after 20 years as a defunct entity.

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

**5. Defendants' California Corporation Went Out of Existence in 1987.**

The California non-profit corporation that allegedly owns the "Caritas Creek" service mark went out of existence in 1987. *See* certified records of California Secretary of State appended hereto as Exhibit A.[12] At no time thereafter did the defendant corporation file any annual report, pay its annual franchise tax to the California Secretary of State, or otherwise register any evidence of existence. *Id.* Defendants have not offered any evidence that the corporation during those years conducted a single annual meeting, performed a single act, or complied with a single one of the formalities or requirements set forth in the California Nonprofit Corporation Law. *See* California Corporations Code, §§ 5000 – 6910.

The fact that Defendants would return to the California Secretary of State on February 17, 2007, reinstate the corporation after twenty years, and then speak of the corporation in these proceedings as though it were a viable entity that owned and monitored the "Caritas Creek" mark during all that time, is emblematic of the weakness in their case. It speaks further to their credibility in general because, while the corporation itself may not be a "sham," Defendants' effort to resurrect the corporation after twenty years as a means of proving ownership in the "Caritas Creek" service mark certainly meets that definition. *See A.E. Hoss v. Purinton,* 229 F.2d 104 (9th Cir. 1955) (holding that party could void its contract with a corporation that failed to file annual reports or observe corporate formalities)

**6. Estoppel**

Defendants argue that the doctrine of licensee estoppel will preclude Plaintiff from succeeding on the merits of its claim. This argument assumes that Plaintiff has been using the "Caritas Creek" service mark for the last 24 years under a license from Defendants. Apart from the reasons set forth above why this cannot be the case, it is Defendants who are estopped from arguing that they exercised sole supervision and control over administration of the Caritas Creek

---

[12] The first page of the certified records demonstrates that the Franchise Tax Board suspended the status of Caritas Creek's California corporation on January 2, 1987. The same document shows that a corporate revivor took effect on February 26, 2007, thus demonstrating over 20 years of corporate non-existence.

program, after (1) failing to rebut the many years of Plaintiff's communications describing both the complete merger of Caritas Creek into CCCYO and CCCYO's programmatic and administrative responsibility for the program (*see,* e.g., Cahill Decl., Exh. A at p. i; Exh. B at p. 4; Exh. M at pps. 2, 3); and (2) taking no action to oppose Plaintiff's termination of Defendant Pardini in March 2000.

The doctrine of laches is an equitable defense that prevents a claim by a party who, with full knowledge of the facts, has slept upon his rights. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001). The three elements of laches are (1) delay, (2) unreasonableness of delay, and (3) prejudice. *Id.* at 952-55. Those elements are established in the present case because (1) Defendants have never objected to Plaintiff's two decades of assertion of control over its Caritas Creek program; (2) Defendants delayed for seven years after the termination of Defendant Pardini before asserting that they possess the authority to challenge Plaintiff's new directives regarding the hiring and firing of Caritas Creek personnel and the various standards of administration established in the months preceding Ms. Pardini's termination; (3) these delays were unreasonable in light of the unequivocal authority established and advertised by Plaintiff concerning the ownership of its Caritas Creek program in the years preceding and following Ms. Pardini's termination; and (4) Plaintiff has continued to invest millions of dollars in the Caritas Creek program during the last two decades on the well founded assumption that Plaintiff owns the "Caritas Creek" service mark.[13]

---

[13] Not only did Plaintiff raise over $3 million for the Occidental facility from the capital campaign in the mid-1990s, CCCYO subsequently used over $1.5 million in revenues from its operating surplus to rebuild cabins and bathhouses at the camp. Cahill Decl., ¶¶13-14. Most recently, Plaintiff initiated a $10 million capital campaign, both for camp facilities construction and renovations as well as an endowment fund to be used for maintenance and Caritas Creek/Summer Camp attendee scholarships. *Id.* Plaintiff's dramatic investment in Caritas Creek's infrastructure has allowed CCCYO to more than double the number of students attending the Caritas Creek program. *Id.*, ¶13. Finally, contrary to Defendants' statement that the Caritas Creek program revenue has supported capital improvements, during Mr. Cahill's tenure, Caritas Creek only has operated at a loss. *Id.* at ¶12.



LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

### B. The Public Interest

Defendants assert that "CYO's proposed changes to the Caritas Creek program are so flawed that any association with the name Caritas Creek and/or the Caritas logo would be detrimental to the public's expectation from the program." Defendants' brief at 18:7-10. Defendants' disagreement with Plaintiff's prospective changes to the Caritas Creek program does not make them "flawed." Plaintiff's prospective changes to the program are correctly aimed at fixing the problems and abuses that plagued the program in recent years as reflected in the communications leading to the termination of Paula Pardini in 2000, Cahill Decl., Exh. D; the letter of complaint dated January 5, 2005, *Id.*, Exh. E; and the Caritas Creek 2007 Plan of Operation prepared by Plaintiff's Director of Programs and Services, Dr. Glenn Motola. Motola Decl., Exh. A. Suffice it to say that Plaintiff has a more conservative opinion than Defendants do about the standards and policies that ought to govern the guidance and supervision of children and young adults in a camping environment.

Moreover, the name "Caritas Creek" is associated by the relevant public with Plaintiff. *See* generally McCarthy Decl. filed herewith. Absent the preliminary relief requested by Plaintiff in this motion, there is consequently a clear and present danger that parents who send their children to a program operated by Defendants under the name "Caritas Creek" will expect those children to be supervised and protected by Plaintiff in accordance with standards associated with Plaintiff's organization. While the public interest always favors the recognition and enforcement of trademark rights, that interest is especially implicated under the facts of this case.

### C. Irreparable Harm

Defendants argue that Plaintiff has presented no evidence to demonstrate that it will suffer irreparable harm should the Court not grant a preliminary injunction. Defendants' brief at 19:23-24. To begin with, irreparable injury arising from trademark infringement is presumed upon a demonstration of likely success on the merits. *Vision Sports Inc. v. Melville Corp.*, 888 F.2d 609, 612, n. 3 (9th Cir. 1989); *Metro Publishing, Ltd. v. San Jose Mercury News,* 987 F.2d

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

637, 640 (9th Cir. 1993). However, it is incorrect to say that the record lacks such evidence. On the contrary, the specific nature of the dispute that led to the termination of Defendant Pardini's employment in March 2000 and that of the remaining Defendants in January 2007, and the public confusion shown in the McCarthy Declaration, illustrate the danger to Plaintiff's name and reputation likely to result from an erroneous public perception that a program operated by Defendants under the name "Caritas Creek" is in any way associated with Plaintiff.

## IV. CONCLUSION

Defendants' lengthy discussion that "Caritas Creek" was the first user of the subject service mark, referring to a California corporation that ceased existence at the latest as of January 1987, has no bearing on the merits of the requested preliminary injunction. The issue is whether Defendants relinquished their claim of ownership in the Caritas Creek service mark when they ceded the program's fiscal, programmatic and administrative responsibility to Plaintiff in 1983 in return for valuable consideration and thereafter became Plaintiff's at-will employees subject to termination for failure to maintain the program. If, despite the overwhelming preponderance of the evidence, the answer to that question is "no," then the issue is whether they exercised any supervision and control over *Plaintiff's use* of the "Caritas Creek" service mark over the following 24 years. If the answer to that question is "no," as it must be, then the Court must grant Plaintiff's motion for preliminary injunction.

Dated: August 8, 2007. Respectfully submitted,

SCHNADER HARRISON SEGAL & LEWIS LLP

By: */s/Matthew F. Miller*
MATTHEW F. MILLER
BRUCE A. McDONALD, *pro hac vice*
Attorneys for Plaintiff
CATHOLIC CHARITIES CYO

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700