MATTHEW F. MILLER (State Bar No. 172661)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
One Montgomery Street, Suite 2200
San Francisco, CA 94104-5501
Telephone: (415) 364-6700
Fax: (415) 364-6785
Email: mmiller@schnader.com

BRUCE A. McDONALD, *pro hac vice*
**SCHNADER HARRISON SEGAL & LEWIS LLP**
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 2006
Telephone: (202) 419-4235
Fax: (202) 419-3454
Email: bmcdonald@schnader.com

Attorneys for Plaintiff **CATHOLIC CHARITIES CYO**

PART 1 OF 2

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**CATHOLIC CHARITIES CYO,** a California non-profit corporation,

Plaintiffs,

v.

**MARY W. GORDON, et al.,**

Defendants.

Case No. C 07-02658 SI

**DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.,* Case No. C 07-02658 SI

**SFDATA 626986_1**

MATTHEW F. MILLER (State Bar No. 172661)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
One Montgomery Street, Suite 2200
San Francisco, CA 94104-5501
Telephone: (415) 364-6700
Fax: (415) 364-6785
Email: mmiller@schnader.com

BRUCE A. McDONALD, *pro hac vice*
**SCHNADER HARRISON SEGAL & LEWIS LLP**
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 2006
Telephone: (202) 419-4235
Fax: (202) 419-3454
Email: bmcdonald@schnader.com

Attorneys for Plaintiff **CATHOLIC CHARITIES CYO**

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**CATHOLIC CHARITIES CYO,** a California non-profit corporation,

Plaintiffs,

v.

**MARY W. GORDON, et al.,**

Defendants.

Case No. C 07-02658 SI

**DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Brian Cahill, declare as follows:

1. I am the Executive Director of Catholic Charities CYO ("CCCYO"). In 1999, I became the Executive Director of CYO. In 2000, I also became the Executive Director of Catholic Charities.

2. CYO and Catholic Charities merged in 2003, and the entity has been known as Catholic Charities CYO since that date. I will make no distinction between the pre- and post-merger names in this declaration. I have personal knowledge of the facts stated in this

DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.*, Case No. C 07-02658 SI

**SFDATA 626986_1**

declaration and would competently testify to these facts if called upon to do so.

3. I have reviewed the opposition papers and declarations filed by defendants in this matter and strongly disagree with various characterizations and factual statements contained in these documents. Defendants make the contention that the Caritas Creek program was not the subject of a merger with CCCYO and that CCCYO and Caritas Creek should be considered separate and autonomous programs. That, quite simply, is not the case. I have at all times during my tenure been advised and understood that CCCYO acquired Caritas Creek in 1983 in exchange for forgiveness of Caritas Creek's debt. CCCYO's internal documents support this fact. Caritas Creek's own Training Manual, relevant pages of which are attached hereto as Exhibit A [brackets added], states: "In the summer of 1983 Caritas Creek merged with the Catholic Youth Organization in a mutual effort to expand the program and to broaden the scope of the organization's service to youth." A 1998 "CYO Organizational Study," relevant pages of which are attached hereto as Exhibit M [brackets added], describes Caritas Creek, at page 2, as one of the "various programs merged into the Catholic Youth Organization." The same report, at page 13, describes the incredible growth of Caritas Creek since being acquired by CCCYO.

4. Not only does CCCYO have full programmatic and fiscal responsibility for the Caritas Creek program, but CCCYO exercises every facet of governance and administration of Caritas Creek as is incumbent upon CCCYO for all of its constituent programs, e.g., St. Vincent's School for Boys, Meals on Wheels, etc. Caritas Creek's Funding Application to the philanthropic group The Guardsmen during Ms. Pardini's tenure as Director of CYO Outdoor Ministry attests at page 4: "CYO Caritas Creek is parented by the Catholic Youth Organization which provides full fiscal and programmatic oversight and responsibility for the program." Copies of the relevant pages of the Funding Application are attached hereto as Exhibit B [brackets added].

5. Every employee within the Caritas Creek program is an employee of CCCYO and has only those employment-related rights and duties enjoyed by CCCYO's other at-will employees. CCCYO has full and ultimate responsibility for every facet of the Caritas Creek program from curriculum approval to managing and approving Caritas Creek's budgets, to

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

-2-

DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.* Case No. C 07-02658 SI

SFDATA 626986_1

supervising and setting hiring policies, to legal and insurance administration, to personnel administration and to facilities management.

6. Defendants suggest that the Caritas Creek staff's job duties demonstrate control of the program. Thus, defendants note: "It was Caritas Creek's staff who recruited schools, signed the contracts with schools, scheduled camps, hired and trained staff, designed the program, created new activities, and conducted weekly and seasonal evaluations of the staff and program activities . . ." Opposition Pleading at 6:1-4. Rather than demonstrating control, these activities were merely the assigned job duties and responsibilities for which CCCYO hired the Caritas Creek staff. This fact is demonstrated under the "Staff and Volunteer Responsibilities" section of the Caritas Creek Guardsmen Funding Application, Exhibit B, referenced above.

7. Caritas Creek, as a program within CCCYO, has at no time had the ability to dictate or countermand any CCCYO action or directive regarding Caritas Creek's management, operation or administration.

8. Until receipt of Mark Swendsen's April 27, 2007 letter, attached to the Complaint as Exhibit O, at no time during my tenure has CCCYO had contact with an entity called "Caritas Creek, a California corporation." I had never heard of such entity.

9. CCCYO has the power to hire and fire all Caritas Creek employees. I reviewed Paula Pardini's statement that she was "forced by CYO administration to resign from Caritas Creek in March 2000." Pardini Declaration at ¶ 18. Unfortunately, it is more accurate to state that CCCYO terminated Ms. Pardini on March 17, 2000, as evidenced by my letter of the same date attached hereto as Exhibit C. Although Ms. Pardini's termination was most immediately precipitated by a violation of CCCYO's alcohol policies, involving an incident at a staff meeting at the Occidental camp, Ms. Pardini's termination resulted from a series of incidents including: (1) failures to implement appropriate staff hiring guidelines; (2) failure to maintain a positive working relationship with the Occidental facility staff; (3) other violations of CCCYO's alcohol and drug policies by staff members; and (4) Ms. Pardini's violation of CCCYO's guidelines for reimbursement of personal expenses. My November 23, 1999, February 7, 2000, February 17, 2000, and February 18, 2000, memoranda to Ms. Pardini, attached hereto collectively as Exhibit

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

-3-
DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.* Case No. C 07-02658 SI
SFDATA 626986_1

D, demonstrate various concerns and problem areas that caused Ms. Pardini's termination in March 2000. These memoranda also demonstrate that CCCYO clearly controlled administration and operation of all facets of its Caritas Creek program and Ms. Pardini's job responsibilities related to the program.

10. Problems with Caritas Creek staff supervision persisted after Ms. Pardini's termination and implementation of new hiring policies. Emblematic of these problems was the January 5, 2005 letter received from the concerned parents of two campers regarding perceived inappropriate comments by a male staffer to campers. A redacted copy of the letter is attached hereto as Exhibit E.

11. CCCYO treats each of its outdoor programs as mutually reinforcing to CCCYO's goal of providing safe and nurturing educational and spiritual growth for the San Francisco Bay Area's youth. Several of CCCYO's capital campaign reports, attached hereto collectively as Exhibit F [brackets added], demonstrate that Caritas Creek has never been considered a stand-alone or separate program that is merely temporarily "housed" at the Occidental facility, but, rather, Caritas Creek has been and continues to be an integral member of CCCYO's renowned Outdoor Programs. As described in one of CCCYO's program descriptions attached hereto as Exhibit G [brackets added]:

> While distinct in terms of months of operation, CYO Summer Camp and Caritas Creek Environmental Education work hand-in-hand to provide year-round recreation, leadership development, and learning opportunities for youth. CYO Outdoor Programs employ a core group of ongoing, year-round staff to run the summer and school-year programs. Philosophically the two programs are intertwined and the curriculum of each is designed to reinforce each other. Forty percent of students who attend summer camp participate in Caritas Creek during the school year.

12. Contrary to defendants' statement in the opposition pleading that Caritas Creek program revenue has supported capital improvements, during my tenure, Caritas Creek only has operated at a loss. From the mid-1990s until the present, CCCYO has dedicated literally thousands of hours to fundraising efforts for capital improvements to the Occidental property that is home to CCCYO's Outdoor Programs including Caritas Creek and Summer Camp. These

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

-4-

DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.* Case No. C 07-02658 SI

SFDATA 626986_1

efforts equally have benefited each of the outdoor programs and allowed CCCYO to house more staff and campers with each major phase of camp renovation.

13. CCCYO's capital campaign initiated in the mid-1990's raised over $3 million for the Occidental facility, allowing CCCYO to more than double the number of students attending the Caritas Creek program. Prior to this campaign, Caritas Creek served only 1,373 students in the 1989-1990 school year, as shown in Exhibit H [brackets added], attached hereto. For the 2005-2006 Caritas Creek school year program, CCCYO was able to serve 3,352 grade school students as shown in Exhibit I [brackets added], attached hereto.

14. Subsequently, CCCYO has used revenues from our operating surplus to rebuild cabins and bathhouses at camp to the tune of $1.5 million. Most recently, CCCYO has initiated a $10 million capital campaign, both for facilities construction and renovations, as well as an endowment fund to be used for maintenance and attendee scholarships.

15. Prior to meeting with the Caritas Creek staff in January 2007, I received a memorandum from Dr. Glenn Motola, CCCYO's Director of Programs and Services, outlining a Plan of Operation for administrative and curriculum improvements for the upcoming Caritas Creek January through May 2007 program. A copy of Dr. Motola's memorandum is attached hereto as Exhibit J.

16. On January 16, 2007, I met with CCCYO's Outdoor Programs Director Paul Raia in the hopes of obtaining Paul's approval of the various changes and his commitment to leading the entire Caritas Creek staff in implementing the changes. Paul informed me that his heart was not in making the changes, and therefore he would not and could not encourage his team to go along with the changes. I told Paul that the only choices were to implement the recommendations or to shut down the spring 2007 Caritas Creek program. Paul advised me that rather than implement the changes he would have to stand by a recommendation to shut down the spring program.

17. I met with Paul Raia on January 19, 2007, before meeting with the remainder of the Caritas Creek staff. I again asked whether Paul would reconsider implementing the changes and leading his team during the spring. Paul stood by his refusal to implement the changes and I

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

-5-

DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S
REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.* Case No. C 07-02658 SI

SFDATA 626986_1

therefore asked for and subsequently received his resignation.

18. Without Mr. Raia's leadership and based upon the remainder of the Caritas Creek staff's unwillingness to implement several of the proposed curriculum refinements, I had the very unfortunate job of discontinuing the spring 2007 Caritas Creek program and advising the staff of their immediate termination. We allowed the staff that was presently residing at the Occidental facility up to 60 days to remain on the facility. On January 19, 2007, I told the terminated staff that summer camp was on and that I hoped many of them would come back to work. At no time did I advise the terminated staff that the Caritas Creek program was to be permanently discontinued.

19. Attached hereto as Exhibit K is a true and correct copy of relevant pages of a CCCYO Caritas Creek Program Summary.

20. Attached hereto as group Exhibit L is a true and correct copy of relevant pages of a 2004 CCCYO grant application to The Guardsmen and my September 23, 2004 letter of appreciation to The Guardsmen for receipt of a substantial grant.

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, declares under penalty of perjury that the facts set forth in this Declaration are true and correct to the best of her knowledge, information and belief.

Executed at San Francisco, California, this 8th day of August 2007.

BRIAN CAHILL

LAW OFFICES OF
SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
(415) 364-6700

-6-

DECLARATION OF BRIAN CAHILL IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
*Catholic Charities CYO v. Mary M. Gordon, et al.* Case No. C 07-02658 SI

SFDATA 626986_1

# EXHIBIT A

# CARITAS CREEK TEACHER/NATURALIST MANUAL

Revised and written by
Alison W. Hill
Fall 1991

TABLE OF CONTENTS

I. INTRODUCTION TO CYO CARITAS CREEK

History of Caritas Creek..........................i
T/N job announcement..........................ii-iii
Details of employment agreement...............iv-vi
CYO Caritas Creek program norms...............vii
T/N professional guidelines...................ix-x
Other job roles at camp.......................xi-xii
Counselor Guidelines..........................xiii

II. TEACHER NATURALIST SCHEDULE OF DUTIES.................1-7

Other Important Things to Know about Caritas Creek:
Campfire..........................................8-9
Assemblies........................................9
Serendipity.......................................10-11
Celebration.......................................12-14
Ritual............................................15-16
Springboard.......................................17-18
Earth In Jeopardy.................................19-20
Electives.........................................20
Roving............................................21-22
Earth Day.........................................24-35
Tidepools.........................................36-38

III. EVERYTHING YOU EVER WANTED TO KNOW ABOUT TEACHING AT CARITAS BUT WERE AFRAID TO ASK

Preparation.......................................39
Setting expectations..............................40
Teaching techniques...............................41
Teaching situations...............................42-43
Counselors on hikes...............................44
Utilizing class prep information on hikes.........45
Writing a good lesson plan........................46

IV. THE HIKES

Boundary hike.....................................47-48
Unnature trail....................................48-49
Unnature trail map................................50
Exploration preparation...........................51
Organization......................................52-54
Redwood activity list.............................55-56
Nature cycles activity list.......................57-58
Trail map.........................................59
Night hike........................................60-61
Night hike trail map..............................62
Rainy day hike....................................63-64

V. ADDITIONAL INFORMATION..............................65-67

1. Alternative Meal Prep
2. Archery
3. Beach Safety Monitors
4. Bus loading
5. Cabin assignments
6. Campfire set-up
7. Canoeing set-up and elective
8. Clean-up
9. Counselor evaluations
10. Counselor meeting
11. Curriculum/Trays
12. Dr. Cool
13. Electives
14. Environmental skits
15. Escort kids
16. First/Aid Safety
17. Freetime
18. Harriman Hall
19. Lunch orientation
20. Lodge
21. Lost and Found
22. Meal Door Monitor
23. Medical meeting
24. New Games
25. Night off
26. Packing & Luggage
27. Rainbow
28. Rise
29. Ritual
30. Roving
31. Serendipities
32. Shopping
33. Sing along
34. Springboard
35. Supetable
36. Tidepool/orientation
37. T/N lunches
38. Welcome

## HISTORY OF CARITAS CREEK

Caritas Creek Environmental Education Program evolved from a group of interested friends (students, counselors, directors, teachers, and parents) who recognized the incredible growth and learning that could occur in an outdoor community living situation. Since 1969, this group had worked together in classroom field studies and summer environmental ventures.

These common experiences and the enthusiastic response from the educational community provided impetus for the 1975 incorporation of Caritas Creek - an Environmental Education Community. In the summer of 1983 Caritas Creek merged with The Catholic Youth Organization of San Francisco in a mutual effort to expand the program and to broaden the scope of the organization's service to youth. Since 1976, Caritas has served 57 elementary and junior high school communities and 57 high schools and colleges.

## BACKGROUND

CYO Caritas Creek is a non-profit environmental education program that serves San Francisco Bay Area students in the 4th through 8th grades. Students participate in a week-long residential camp experience to explore and learn about the natural environment, to learn how to relate more fully and openly with their peers, and to build their sense of self-esteem and empowerment in their individual lives. The Caritas Creek staff works closely together, and consists of the Director, the Associate Director, the Counselor Coordinator, and approxiamately nine Teacher/Naturalists. The site is a 250 acre, full-facility camp with redwood forest, pond and stream areas. It is located near the town of Occidental in Sonoma County, 2 hours north of San Francisco.

## WHY WE DO IT

SOCIALLY:

1) To allow students to see and experience alternatives in:
   a) interactions: open communication, no put downs
   b) outlooks: different viewpoints
   c) living arrangements: sharing a cabin
   d) activities: games which everybody wins
   e) food: low sugar diet
   f) entertainment: no radios or televisions

2) To provide a sense of community:
   a) A group of people working together concerned with the well being of the parts as well as the whole.
   b) Exposure to other socio-economic groups.
   - Our clientele includes schools from vastly different socio-economic groups. We purposefully schedule groups from different backgrounds together and facilitate their interactions.

EMOTIONALLY:

1. To heighten student's awareness in terms of how their choices impact others.
   a. Serendipities
   b. Ropes course

2. To hold students accountable for their actions.

3. To provide an atmosphere in which students feel safe to show their feelings.
   a. no put downs
   b. active listening
   c. confidentiality

SPIRITUALLY:

1. To provide a time and environment conducive to looking within.

2. To provide exposure to other aspects of spirituality.

ACADEMICALLY:

1. To provide an integrated multidisciplinary curriculum.
2. To provide experiential learning.
3. To inspire students about the excitement of learning through outdoor exploration.
4. To cultivate awareness of our relationship with the natural environment.

# EXHIBIT B

Caritas 2000-01

## THE APPLICATION FOR GUARDSMEN FUNDING

Please complete the entire application. You may attach additional pages to respond. Please label your pages to correspond to the question you are answering. If you have any questions or need assistance completing this form please call The Guardsmen office at (415) 781-6785.

### Section I - General Information

*This section pertains to your agency's year-round activities. If you are a national agency please provide information regarding the local entity. Sections II-V are directed to your summer program.*

1. Name of Agency: The Catholic Youth Organization
2. Address: One St. Vincent's Drive, San Rafael, CA 94903
3. Phone Number: (415) 507-4256 Fax Number: (415) 491-0842
4. Federal Tax Identification Number: 94-1748309
5. Type of Entity: Corporation, Foundation, Other (please explain) Non-Profit Corporation
6. Exempt under Internal Revenue Code Section: 501(c)(3)
7. Contact Persons: Paula Pardini Title: Director - CYO Outdoor Ministry
   Joel Dunlap Title: Associate Director - CYO Outdoor Ministry
8. Does your agency close for any significant period of time during the year? No
   If so, when? N/A
   Please provide the name, address and telephone number of the contact person for the time your agency is closed: N/A
9. How long has your agency been in existence? 145 years (since 1855)
10. Have you ever received Guardsmen funding? Yes If yes,
    (a) For what purpose? Camperships for CYO Camp Armstrong & Caritas Creek Environmental Education Program
    (b) How long has your agency been involved in The Guardsmen Campership Program? Since the 1960's
11. Is your agency a subsidiary or branch of another agency? No

## ORGANIZATION AND MANAGEMENT

12. Provide your organization's mission statement.

## 12. ORGANIZATION MISSION STATEMENT

CYO's mission is to provide for the spiritual, physical, social, recreational and emotional welfare and well-being of children and youth. The cornerstone of the organization is St. Vincent's School for Boys, which was founded in 1855 by two pioneering nuns to care for orphans of California's Gold Rush. From these beginnings, CYO has grown into a thriving, vital caregiver of Bay Area children and youth, intervening successfully in the lives of "everyone's child and no one's child" through an array of programs and services.

CYO serves children and youth of all races without regard for national origin, gender, economic/cultural/religious background, or familial status. CYO programs include a home-based intervention counseling program for children and families in crisis; the largest residential treatment service network for youth in Northern California (including group homes and a foster family program); Archbishop McGucken Center, the hub of CYO's outdoor programs (featuring Caritas Creek Environmental Education Program and Camp Armstrong); sports and recreation programs (organized team sports leagues and holiday and summer day camps for more than 8,000 Bay Area children annually); child care services; and transportation services which specialize in the transport of school and at-risk youth.

CYO Caritas Creek Environmental Education Program supports CYO's mission by providing an exciting environmental education experience for S.F. Bay Area students in the 4th-8th grade, and an intensive teaching and childcare training program for high school students. The CYO Caritas Creek Program provides:

- An investigative, multi-disciplinary curriculum that emphasizes the interdependence of People, God and Nature, allowing students to learn hands-on academic knowledge, to develop new personal connections, and to discover new recognitions of spirituality.

- An integrative living and social situation that promotes a sense of self-worth, and a program that helps students discover affirming ways of working together with diverse people to build a caring, mutually respectful faith-based community.

- A constructive social and moral curriculum that empowers students to make positive choices in their lives for themselves, other people, and the environment.

13. Describe your organizational structure and your method for financial and management control. Please include a list of the names of your Board of Directors and officers. Describe the responsibilities of your staff and volunteers. (If using attachments or separate sheets please number with question addressed.)

## 13. ORGANIZATIONAL STRUCTURE AND FINANCIAL MANAGEMENT

CYO Caritas Creek is parented by the Catholic Youth Organization which provides full fiscal and programmatic oversight and responsibility for the program. Caritas Creek is guided by the administrative leadership of CYO, and utilizes extensive volunteer and staff resources gained through a 140-year history of providing diverse programs to Bay Area youth. CYO administration, staff, and volunteer resources, and governing bodies–which include the St. Vincent's Advisory Board, CYO Board of Trustees (including Finance, Development, and Program sub-committees), and other philanthropic support groups of the organization–provide valuable expertise and support for capacity-building and sound management of the organization's financial and program infrastructure. CYO Caritas Creek seeks to reflect the communities and populations served by its programs by recruiting the active participation of diverse, culturally representative staff and volunteers.

(See next three pages for CYO Board of Directors, CYO Organization Flow Chart, and Caritas Creek Program Staffing Stucture)

## 13. STAFF AND VOLUNTEER RESPONSIBILITIES

CYO Organizational Structure and Board of Directors

(See attached Flow Chart and current list of Board of Directors)

CYO Caritas Creek Environmental Education Staff Positions & Responsibilities:

1. Director of Outdoor Ministry (1): Supervises program development and implementation; client school recruitment, budget development / implementation / management; staff recruitment / hiring / evaluation. Actively works with and directs on-site program weeks.

2. Associate Director (1): Supervises program development and implementation: Actively manages budget development / implementation / daily management; actively recruits / hires / supervises / evaluates / staff. Assists DOM with client school recruitment. Actively works with and directs school groups in on-site program weeks.

3. Assistant Directors (2): Actively oversee mechanics of program implementation and staff training. Actively work with and direct school groups in on-site program weeks.

4. Teen Leadership Coordinators (3): Develop and implement recruitment, training and supervision of volunteer junior and senior high school students as cabin counselors for program weeks.

5. Teacher / Naturalists (16): Teach 4th-8th grade students environmental education program curriculum and activities during program weeks

6. Peer Ministers (4): Assist Teen Leadership Coordinators in recruitment, training and supervision of volunteer high school students as cabin leaders during program weeks.

7. Cabin Leaders (20 per program week): Lead a cabin group of 8 students during a program week.

CYO
THE CATHOLIC YOUTH ORGANIZATION ORGANIZATIONAL CHART
CYO Board of Trustees
Archbishop William J. Levada, *President*
Charles I. Daniels, Jr., *Vice President*
Associate Director/Chaplain
*Reverend Thomas Daly*
Executive Secretary
*Dorothy Alvarez*
Executive Director
*Brian F. Cahill*
Chief Financial Officer
*Terry Fuetsch*
Corporate Administration
Accounting & Finance
Computer Services
*Paul Bongiovanni*
Human Resources
*Jay Webster*
Development
*Geraldine Dooley*
Annual and Planned Giving
Corporate & Institutional Support
Individual Donors
Grant Writing
*Deidre Rettenmaier*
Special Events
*Susan Neff*
Facilities Management
*Steve Grant*
Capital Improvements
Buildings & Grounds
Rentals/Leases
McGucken Center
Program Manager
*Bruce Blagsvedt*
Food Service Manager
Community Based
*Marie de Porres Taylor*
Athletics
Marin, *Steve Farbstein*
San Francisco, *Joann Dillon*
Mission Day Care
*Liliana Rossi*
Family Based Crisis & Support Program
*Sister Albertina Morales*
Canal, *San Rafael*
Foster Family Agency
New Ventures
Sacred Heart, *San Francisco*
St. Anthony of Padua, *Menlo Park*
Outdoor Ministry
*Paula Pardini*
Camp Armstrong
Caritas
Ropes Course
Associate Director, Admin.
*Joel Dunlap*
Associate Director, Program
*Paul Raia*
Ropes Coordinator
*Chris Reid*
Teen Leadership Coordinator
*Frank Ross*
Residential
*Kent Eagleson*
St. Vincent's
Program Director
*Dan Gallagher*
Clinical Director
*Annette Rankin*
San Francisco Boys' & Girls' Home
Program Coordinator
*Wendy Calomiris*
Program Manager
*Denise Mayfield*
Timothy Murphy School
*Dr. William Rumford*
Transportation
*Marty Rea*
Assistant Director
*Bill Avalos*
Charters
Program Transportation
School Bus Routes
Vehicle Insurance
Vehicle Leasing/Purchase
Vehicle Licensing
Vehicle Maintenance

# EXHIBIT C



**The Catholic Youth Organization**
*Serving Children and Youth Since 1855*
One St. Vincent Drive, San Rafael, CA 94903 (415) 507-2000 ▪ Fax: (415) 491-0842

March 17, 2000

Paula Pardini
99 Monte Cresta Avenue, Unit C
Oakland, CA 94611

Dear Paula:

As a follow-up to our meeting on Tuesday, March 14th, this correspondence is to inform you your employment with CYO is terminated effective immediately. As I mentioned during our meeting, your inability to appropriately manage program and staff and your tolerance of violations of the Agency's alcohol policy necessitated this decision.

You previously received memos where I expressed my concern about your performance. My February 18, 2000 memo to you expressly stated "Future transgressions or failure to appropriately carry out your administrative duties may result in disciplinary action up to and including termination." You acquiesced in the consumption of alcoholic beverages by staff at its March 10th meeting in direct contravention of the Caritas Creek Norms and Polices on Drugs/Alcohol. You failed to impress upon your staff that no alcohol was to be consumed on site except during staff training lodge dinners, which the March 10th staff meeting decidedly was not.

Your actions cannot be tolerated in this social services agency.

Enclosed is your final paycheck for sick days taken Thursday, March 16th and Friday, March 17th, and accrued vacation payable to you. Your regular paycheck for the period March 1st through March 15th has been deposited to your credit union account as usual. Also, enclosed is your employee reimbursement check in the amount of $320.61 covering your last two expense report submissions. You will also receive information regarding continuation of benefits under COBRA requirements. All personal items belonging to you will be shipped to your home address.

You will need to return via mail all CYO property in your possession including credit cards, cell phone, keys, program material, files, and all other items belonging to CYO.

Respectfully,

Brian Cahill
Executive Director

*St. Vincent's School for Boys*
*Boys' and Girls' Athletics*
*Transportation Services*
*St. Vincent's Foster Family Agency*

*San Francisco Boys' and Girls' Home*
*Camp Armstrong*
*McGucken Conference and Retreat Center*
*CYO Ropes Adventure Course*

*Mission Day Care*
*Caritas Creek Environmental Education*
*Youth Ministry Services*
*Family Based Crisis and Support Program*

# EXHIBIT D

**Memorandum**

**To:** Paula Pardini
**From:** Brian F. Cahill, Executive Director
**Date:** November 23, 1999
**Re:** Follow-up to Recent Meetings

---

As a follow-up to our recent meetings, especially the most recent meeting relating to the EEOC complaint, I wanted to reiterate a few of my comments. I think you know that I have a great respect and enthusiasm for the program components of Outdoor Ministry. I am pleased that the individual staff members we discussed have been terminated. However, the original decision to hire them creates a great deal of liability for your program, conflicts with the mission of Outdoor Ministry, and would clearly upset most parents who send their children to be in our care. As I have made clear to you, there are certain administrative areas where I expect greater scrutiny. The following guidelines are to be implemented immediately:

**1. The Outdoor Ministry will only hire staff of appropriate qualifications, and without exception will not hire individuals who:**

- **Have criminal backgrounds,**
- **Are former clients of our residential programs,**
- **Have been terminated by other programs.**

While I admire and share your interest in affecting the lives of disfranchised and at-risk young adults, the purpose of Outdoor Ministry is to deliver quality summer camp, environmental education and ropes adventure programs to our clients -- the youth we serve. The mission is not job training, rehabilitation or other outreach to at-risk employees. Continue to work closely with Jay on this.

**2. You are to develop policies addressing staff cohabitation, parties and alcohol consumption on CYO property that are consistent with the mission and values of CYO. Jay and Steve can consult with you and we can all meet to review these policies prior to implementation.**

As I shared with you, the agency has been very lucky that a devastating liability issue has not developed over the aforementioned issues. We cannot count on that luck to continue and must implement preventative measures. Also, Jay will be working with you to develop in-service training for all areas relating to sexual harassment.

**3. All McGucken Center facility and housing decisions will be made jointly with Facility Director Steve Grant.**

The success of the Outdoor Ministry division and the McGucken Center are highly interdependent and this relationship must operate as a partnership. For this reason, program decisions are to be made by you and facility decisions are to be made by Steve Grant. When there is disagreement or conflict, I will make any binding decisions. An example of an issue that requires Steve's approval is the on-site housing arrangements for all program staff.

Paula, I require your full cooperation and attention to these matters. I look forward to meeting with you and your Management team to review these issues. I also want to say that I appreciate your willingness to listen and respond to the concerns I raised.

# MEMORANDUM

**DATE:**    February 7, 2000

**TO:**    Paula Pardini

**FROM:**    Brian Cahill

**SUBJECT:**    Administrative Issues

---

Back in November, we began meeting to discuss a few serious areas of concern that I needed you to address. The meetings were necessitated following the EEOC complaint and my concerns regarding the suitability of certain staff members to work with our clients. (Those staff members have since terminated and you have been instructed to exercise greater prudence in the staff selection process).

As a follow-up, I sent you a memo dated 11-23-99 detailing how to remedy the areas of concern. Those specific areas are (1) hiring of appropriate staff, (2) development of sound and consistent policies and (3) maintaining a positive working relationship with the McGucken Center facility staff.

The intent of this memo is to provide you feedback on the aforementioned issues. First of all, I want to thank you for working closely with Jay Webster and collaboratively producing the policy language. I want to reiterate that our policies and practices need to protect the agency and our clients. Additionally, we must exercise vigilance when it comes to employee selection and focus on the needs of the clients and the program's mission. With that said, attached you will find the approved Outdoor Ministry Norms and Policies.

Jay has informed me that all Outdoor Ministry management & line staff have completed sexual harassment training. Please continue to work closely with Jay and see that this training continues on a regular basis when new staff is hired. Also, I would like to see additional training of staff on how to deal with sexual issues involving clients.

In closing, it is of the utmost importance that Outdoor Ministry apply the same passion and conviction to administrative issues as it does to program issues.

Respectfully,

Brian Cahill
Executive Director

# MODIFICATIONS TO CARITAS CREEK NORMS AND POLICIES

*Part I- Norms*
**Drugs/Alcohol**

    2. CYO/Caritas Creek upholds the following alcohol policy:
       a) Alcohol may only be stored and consumed in private residences.
       b) Alcohol will not be consumed in the presence of campers.
       c) Alcohol is not to be served at any on-site staff function sponsored by CYO. (Exception: during staff training lodge dinners, wine may be as long as no campers are present.)
       d) Employees are not to consume alcohol while on-duty.
       e) Employees are not to be under the influence of alcohol while on-duty or in the presence of campers.

*Part II- Employment Agreement*
**Housing**

Room assignments are based on staff member status as single individuals or married couples.

*Part III- Hiring Policies*
**Criminal History**

To ensure the safety of our clients, CYO conducts thorough background checks of potential employees including fingerprinting and criminal history clearances. While a prior criminal record does not by itself bar a person from employment consideration, we will take all necessary steps to protect our clients.

Specifically, CYO will reject any applicants with the following backgrounds:
- Felony conviction
- Any convictions involving violent behavior
- Any conviction involving sexual misconduct
- Any conviction involving a crime against a minor
- Any conviction that would bar the applicant form employment within the California education system

**C. Former CYO Employees – Hiring Of**

Before considering the application of former employees of other CYO programs, Outdoor Ministry will contact the appropriate program to conduct reference checks. Employees terminated from other CYO programs will not be considered for employment with Outdoor Ministry.

**Former CYO Employees – Hiring Of**

Before considering the application of former employees of other CYO programs, Outdoor Ministry will contact the appropriate program to conduct reference checks. Employees terminated from other CYO programs will not be considered for employment with Outdoor Ministry.

**B. Residential Treatment Clients – Hiring Of**

The agency will exercise extreme caution when considering the employment of former clients of our residential treatment centers. We must be mindful that our residents have traumatic histories that include serious emotional problems, physical & sexual abuse and life-threatening behaviors.

With this in mind the hiring of former clients is subject to the approval of CYO's Executive Director. The Executive Director may consult the advice of our residential treatment professional staff to gauge the appropriateness of a former client.

# MEMORANDUM

**DATE:**      February 17, 2000

**TO:**        Paula Pardini

**FROM:**      Brian Cahill

**SUBJECT:**   Personal Expenses

---

I am writing you to reiterate that the CYO budget does not allow for reimbursement of personal expenses unrelated to the direct operation of agency business.    Attached you find a reimbursement form submitted by one of your employees, Paige Pleasant. The form seeks mileage reimbursement for expenses related to the moving of your furniture and other personal errands. This form was received shortly after a similar check request was submitted for Dion Jones for duties such as washing your vehicle.

Paula, this is totally unacceptable. I have confirmed with Terry Fuetsch and that Father David Ghiorso clearly informed you that such practices were prohibited. I expect you to immediately desist in such activities.

Given the tenuous nature of the agency's, as well as Outdoor Ministry's budget status, I know that you will adhere to this established directive. Please also take all steps to reeducate your staff on this policy. Any failure to comply with this policy will result in disciplinary action, up to and including termination.

Respectfully,

Brian Cahill
Executive Director

# EXHIBIT E

1/5/05

Mr. Paul Raia
Director, Caritas Creek
P.O. Box 188
Occidental, CA 95465

Dear Mr. Raia,

Our sons are 7th graders at Holy Trinity Church in El Dorado Hills, California. They, along with most of their 7th grade class and their teacher, Mr. Poggi, attended camp at Caritas the week of December 5th through the 9th. Before the trip, one of the naturalists from Caritas came out to Holy Trinity for a parent orientation. We were given the opportunity to ask questions and voice our concerns. Our greatest concern was about the high school students who would be assigned as cabin leaders. We were assured that the high school students who are selected are students who are high achievers with no missing homework who need service hours for school. We were told that they undergo training and are monitored by the adults at the camp. We were told that the high school students really are not even considered "full cabin leaders" because there is almost always a naturalist or teacher right there with them when the children are present. We were left with the impression that these students are a very minor part of our children's experience at the camp. That they are there mainly to help make sure they get from one place to another safely and in an orderly fashion.

We were misled in the worst way. The first words my son said to me once he got off the bus after the trip were, "Mom, our cabin leader told us he was bisexual." He then went on to describe the many stories this high school student, , had shared with the boys in his cabin. The very first thing did was to escort the boys to their cabin and proceed to sit them all down and tell them he was bisexual. When one of the boys, an eleven year old, asked what that was, told them that he is attracted to both boys and girls. The boys were confused and worried about what to do. The next day word got out and Mr. Poggi attempted to have removed from the cabin. The boys were relieved to hear he would not be coming back only to find that he indeed would be coming back and Mr. Poggi would be sleeping in the cabin as well. The boys we were told by someone from Caritas that "the camp is one of the only places feels loved and accepted" so he would be coming back to the cabin. What about the feelings of the kids? These are eleven and twelve year old boys who came to camp to learn about nature and God and ended up having to talk about homosexuality without the guidance of their parents. What about the feelings of these impressionable kids? These kids came to Caritas to learn about God and nature and ended up learning about homosexuality without the guidance of their parents. Even in public school, written permission is required before any kind of discussion of a sexual nature can take place with a student. What are the rules of conduct for these cabin leaders? When I spoke to you on the phone you stated that these high school students are specifically told not to discuss their childhood or any personal issues with the children. Once it was known that

did this it seems logical that he would have been removed from the cabin if not from the camp. Upon being alone with the boys, went on to tell them that his father had left him when he was young and that he had no toys to play with and had a very lonely childhood. His father came back into his life when he was sixteen. By then knew he was attracted to boys and that his father would not like this. He told the boys in the cabin that he would pretend that he was going for a run so that he could meet his boyfriend. He attempted to educate the boys on why people are gay and also stated that "society looks down on gays but promotes sex before marriage for heterosexuals." Clearly, the things he said to these boys were highly inappropriate and out of line. Why did he have all this time with our children with no other adult around to monitor his conversations? Especially after he had stated he was bisexual and clearly wanted to make a point of letting the boys know this. Aside from the sexual nature of his conversations, he told the boys that "shit" was his favorite word and they better get used to hearing it. He also gave them candy and told them to hide it under their pillows. When one of the boys let the candy show, referred to his as a "dumb ass". Is this the kind of role model our children spend time with at Caritas?

As parents who trusted you with our children, we are extremely disappointed in the behavior of and in the way this matter was handled. We would like to hear from you as to what the consequences, if any, were for this cabin leader. In addition, we would like to know if you plan on putting guidelines into place to avoid a similar situation in the future.

Sincerely.

received by Glenn on Tues, 1/24/06 at all mgrs. meeting.

# EXHIBIT F

CAPITAL CAMPAIGN

**Case Statement**
**CYO Camp Capital Campaign**

**Overview**

In fall 2002, under the leadership of Board Chair Clinton Reilly, the Board of Directors of Catholic Charities ❖ Catholic Youth Organization prioritized the need to renovate the "old side of camp" due to the run-down, dilapidated condition of the cabins, bathhouses, and meeting/kitchen facilities. While the natural surroundings provide abundant beauty and inspiration for the programs which take place there, the built structures present potent safety risks for the children who use them and equally compelling liability issues for the organization.

In a presentation to the Board of Directors on (date), Clinton Reilly made an impassioned presentation requesting Board support for this effort. Supplied with cost estimates from Steve Grant, Facilities Director, an initial price tag of $6 million was set. At this stage, the capital needs were broadly defined as including new cabins, bathhouses, lodge/gathering facility, infrastructure, and site work including road improvements.

A closer look at the initial scope of work, including challenges presented by the property itself (its topography, geographical features such as Salmon Creek, and the result of soil studies conducted by a geologist in (date)) and the needs and use demands of the programs which operate from the site, has revealed the necessity of modifying the initial plan. These modifications are significant. It should be noted that at one point the scope of the project was redefined to be as comprehensive as possible, mainly from a program perspective, resulting in a jump in the cost estimate from $6 million to $10 million. One of the more sizeable additions to the needs list at this point was staff housing at $1.8 million. More recently, a "middle ground" has been established for rebuilding the old side of camp which takes the needs of the programs into account without going overboard, and which is mindful of the fundraising capacity of the organization, particularly during the present economic climate and in light of the other heavy financial obligations of the organization. The scope of work as we have defined it follows after a brief history of the capital campaign on the new side of camp.

**Competing Needs: New and Old Sides of Camp**

Archbishop McGucken Center is home to CYO Outdoor Programs which provide important educational and leadership development experiences to more than 10,000 Bay Area youth each year and provide thousands of hours of youth-centered programming from the site annually. Approximately half of all youth served each year are low-income, at-risk youth reflective of the Bay Area's cultural diversity. In addition, CYO Outdoor Programs are the leading provider of outdoor education to Catholic youth in the Bay Area.

Financial support for both the completion of facilities on the new side, and construction of new facilities on the old side is needed. Support for the capital needs on the new and old sides of camp is needed to support the core objectives of CYO Outdoor Programs, of which the development and advancement of low-income, disadvantaged youth from impacted urban communities and Catholic youth from all over the Bay Area is tantamount.

While the built environment on the old side of camp has not seen any substantial improvements since the structures were originally built in the late 1960s, the deteriorating condition of these facilities have been overshadowed by the capital campaign still underway on the new side of camp.

**Scope of Work**

**Summary of Projects: New Side**

**1989:** Recognizing the need to renovate and revitalize the facilities at McGucken Center, CYO made this work a major priority of the *Campaign for Children and Youth*, a capital campaign designed in 1989 to position CYO capital facilities for a new generation of use.

**Spring 1991:** CYO began a "comprehensive" effort to create a new Master Plan for McGucken Center. Rev. David A. Ghiorso, CYO Executive Director from June 1996 through January 1999, led the planning effort, working in conjunction with licensed building and construction contractor Steve Grant (who shortly thereafter was hired as CYO's Facilities Director), CYO trustees, and assisted by Bruce Corson of Corson Associates Architects.

**Late summer 1993:** Master Plan construction activities began. The implementation of the Master Plan consists of three phases. Since the campaign's inception, the sequencing of construction activities has been organized to minimize disruption of ongoing, year-round, revenue-producing activities at McGucken Center.

- Total cost for implementation of the entire Master Plan: $3,515,400
- Raised and expended to date: $1,990,400
- Previous balance remaining to complete all projects: = $1,525,000
- New balance to complete Phase III: = $1,215,000

These three phases are briefly described here:

**Phase I (complete): = $534,600**

- Main Lodge was substantially renovated: re-roofed, made accessible to persons with disabilities, and brought up to current fire and seismic codes.
- The interior floor plan of the Lodge underwent major transformation (skylights, enlarged windows, improved lighting and heating systems, and "break-out" meeting rooms).
- Energy- and water-conserving measures in the bathroom and kitchen facilities comprised part of the extensive remodeling of these two areas.

**Phase II (complete): = $558,800**

- Sports courts and swimming pools were extensively renovated.
- Work on site circulation addressed re-vegetation and erosion control issues.
- In preparation for Phase III, designs for a new septic system were implemented.
- New staff housing was completed (Day House).

**Phase III: Cabin Communities and Mini-Lodge**
**Total Cost = $2,422,000**

There are two parts to Phase III. The first part of Phase III is well underway, and includes rebuilding the cabins and bathhouses to create new cabin communities. Four new cabin communities consisting of three double-sided cabins each will be constructed and their common areas substantially redesigned to enhance the integrity of cabin communities and group identity of participants. Three new bathhouse facilities, consisting of a newly constructed upper and lower bathhouse and a redesigned cabin/bathhouse structure, will provide bathhouse facilities for the new cabin communities. In the second part of Phase III, the Mini-Lodge will be constructed, and the downstairs portion of the Main Lodge will be renovated.

**Where Phase III stands today (financial)**

CYO has raised and expended $897,000 for Phase III projects achieved to date. CYO must raise the balance of $1,215,000 to complete Phase III and the Master Plan.

**Since 1998, gifts to the campaign have included:**

- $231,000 from wills and bequests to CYO
- $100,000 from the William Randolph Hearst Foundation
- $60,000 from timber harvest proceeds
- $100,000 from the Wayne and Gladys Valley Foundation
- $25,000 from the Crescent Porter Hale Foundation
- $25,000 from the Bothin Foundation
- $5,000 from Lakeside Foundation

**Where Phase III stands today (construction progress)**

**Cabins and Bathhouses**

Two remaining cabin communities of three cabin pairs each—one of which already has the construction of its new (upper) bathhouse completed--must be built in order to finish Phase III. These are referred to as the third and fourth cabin communities.

The fourth cabin community is being built before the third community. Construction of the first pair of cabins in this fourth community is complete (Cabins 23 and 24). Construction of Cabins 21 and 22 and Cabins 19 and 20 is underway and will be finished by the beginning of summer 2003.

**Main Lodge**

Main Lodge projects have been distilled down to the essentials of completing the seismic upgrade and remodeling the downstairs bathrooms at a total cost of $125,000.

**Camp Entrance**

A redesign of the entryway to the property has been added to the list of projects remaining on the new side of camp. The complete lack of visibility when entering and exiting the property poses a real hazard to our own clients arriving in school buses, staff utilizing their own and company vehicles, and local traffic along Bohemian Highway. Later we will discuss how this and other discrete portions of the larger project will serve to ease neighborhood tensions which could tie up the entitlement process.

**Funding Considerations: New Side**
Please note that the fourth cabin community is being built with a small portion of funds (listed above) from foundations, the recently earmarked $300,000 from wills and bequests, and $130,000 that was designated for the Crazy Horse kitchen remodel on the old side of camp but not used. The completion of the fourth cabin community marks the end of funds we currently have available. {Another cabin community (consisting of three double-sided cabins) and three remaining cabin pairs are slated for construction}?, along with one more bathhouse. The first two cabins in the third community can be started once summer camp has concluded, provided enough capital can be generated in the next six months to keep projects on the new side going.

The cost of building a Mini-Lodge to replace Harriman Hall ($620,00), while substantial, has been diverted to the project budget outlined for the old side.

It should be remembered that we are contractually obligated, based on grant agreements we have entered into with numerous foundations such as the Hearst Foundation, Crescent Porter Hale Foundation, Kresge Foundation, and Wayne and Gladys Valley Foundation, to fulfill the projects slated for Phase III in their entirety. These donors would not be viable prospects for the old side if original projections for completing the new side are left unfulfilled.

Once capital from "alternative funding sources" is secured to finish the new side, these remaining projects can continue in the year it is currently taking to complete the entitlement process for the old side of camp. Meanwhile, a fundraising plan for the capital campaign on the old side can be formulated and begun.

**Summary of Projects: Old Side**
In order to balance the renovations that are still needed on the new side of camp with the needs that must be addressed on the old side, we are in need of Board guidance to develop a fundraising strategy and map out a financial plan (based on funding from "alternative sources") to finish the cabins, bathhouses, and Main Lodge projects on the new side.

**Seasonal Cabins**
Perhaps the biggest modification to the scope of the project as it was initially sketched out is the decision to build seasonal cabins on the old side of camp rather than permanent structures. This decision was based on the facts we have at our fingertips. Simply put, it seems wiser to invest capital in developing the known quantity of the new side of camp that is substantiated by years of measurable, year-round use that exceeds the current capacity. The new side of camp is used 11.5 months per year, with 50 additional programs days during summer, plus X (from Steve) weeks of year-round retreat use that generates ($X) annually. Caritas Creek provides the heaviest and most reliable stream of clients; this program operates on the new side 25 program weeks per year, with 160-192 clients per week. In contrast, the old side is used 2.5 months per year during summer camp by a total of (X) clients. It seems clear that we need to finish the revenue-producing side of camp that already supports year-round use that will allow us to operate at an optimal program level. Doing so will foster credibility among donors we'll need to approach for gifts to the old side.

**Mini-Lodge**

Accompanying the decision to build seasonal cabins on the old side of camp is the plan to focus resources on the construction of a new Mini-Lodge on the new side of camp in lieu of rebuilding the Crazy Horse kitchen facility on the old side or building an entirely new lodge at Eagle's Nest on the old side. Again, building expensive, permanent structures on the old side of camp is not supported by the use demands on the property and programs. Additional meeting space on the new side of camp is, however, a necessity, both in terms of providing greatly needed indoor meeting space for Caritas Creek, summer camp, and year-round retreat programs, and generating $50,000 in revenue annually to support the programs and maintenance needs on both sides of the property. Without an endowment to support maintenance of the facilities, it's imperative that we build in the ability to generate additional revenue to maintain the facilities over time.

A new Mini-Lodge to replace the old Harriman Hall (already demolished to make room for more cabins) will accomplish this. In addition, a new Mini-Lodge on the new side of camp will create new marketing opportunities and stimulate program growth. The cost of a new Mini-Lodge is the one portion of the original Master Plan for the new side which has been diverted to the budget for renovations of the old side of camp.

**Reconfiguration of Summer Camp**

As this new picture of the new and old sides of camp begins to take shape, a reconfiguration of summer camp is emerging that will improve the quality of the program and the quality of the summer camp experience for campers. As you will see, restructuring summer camp will virtually eliminate the need to provide food and lodging services on the old side of camp.

Restructuring summer camp has numerous bonuses: it will reduce staff burn-out (known to be high during the summer months as staff concludes the yearly program cycle with the intense demands of summer camp) and result in less impact on the property from having fewer kids on site at any given time. Fewer kids on the property per session will not only reduce wear-and-tear on staff, facilities, and environs, but it will reduce liability issues and place greater staff attention on campers.

This will be accomplished by building in more program days (from 44 to 50) during summer camp in five 10-day sessions instead of four, and allowing for a larger span of ages per living unit. The total number of cabin units on the old side will be reduced from four to three (Stepping Stone will be eliminated). This will, in turn, eliminate the problem of over-crowding by housing 300 campers in each of the remaining three living units instead of the usual 400. Needless to say, restructuring summer camp in these significant ways will, most importantly, result in a healthier and safer camp overall for children and youth.

By improving the health and safety of the summer camp environment by restructuring summer camp, we further reduce the need for permanent structures on the old side. By doing so, we anticipate a capital campaign that is realistic and in step with the financial demands and capabilities of the organization.

As can be seen by a tour of the old side of camp, the current living units are dilapidated, unsafe, and present huge liability risks. Their present condition discourages program growth (and revenue) as

participants are not inclined to return due to their poor condition. The condition of cabins on the old side are out of sync with the organization's and programs' standards of quality, and, in short, reflect poorly on the efficacy of the organization to provide relevant services to its client base.

Building seasonal cabins on the old side will replace old and unsafe Stepping Stone, Wildwood, and Tentville living units. The elimination of Stepping Stone will reduce the environmental impact along Salmon Creek, opening the door for program growth through the development of a watershed curriculum and creek restoration activities (and opportunities to fund them). Stepping Stone will be replaced by a Nature Pavilion, further fueling program growth by providing a destination for hiking day trips, overnight camp-outs, court sports, amphitheatre gatherings, campfires, and swimming in Miwok Pool. Intended as an outdoor gathering hub and activity staging area, the Nature Pavilion will replace the need to build a permanent lodge facility at Eagle's Nest. Furthermore, the elimination of Stepping Stone will lessen the impact of noise on neighbors, and strengthen our environmental position should we decide to pursue a conservation easement agreement that could yield in excess of $1 million for the capital campaign on the old side.

To complete the construction of new cabin communities on the old side of camp (18 seasonal cabins will be built at a cost of $25,000 each), new bathhouse facilities on the old side will be built for those communities replacing Tentville and Wildwood. A smaller bathhouse will be built to accompany the Nature Pavilion and Miwok Pool. These 2.5 bathhouse structures are estimated to cost $562,500.

**Staff Housing**
Of equal importance to the need to construct seasonal cabins is the need to rebuild all of the staff housing on the old side of camp.

The biggest single line item in the list of projects outlined for the old side at an estimated $1.5 million, new staff housing is an extraordinary expense. However, rebuilding staff housing will be worth every penny when considering the returns on our investment.

Staff housing on the old side of camp consists of (name structures and how many staff each house). These structures were built between (time span) and, aside from minor repairs to keep them functional, have undergone no major renovation since. Staff housing, like the cabins on the old side of camp, is in dire need of improvement. Not only is staff housing substandard in every way, it also presents huge health, safety, and liability risks. More importantly, the present condition of staff housing is a major obstacle to finding and keeping qualified staff. Staff is discouraged from long-term association with the program due to inferior living conditions which include run-down buildings, makeshift sleeping quarters, poor heating, questionable water quality, over-crowding, lack of privacy, dampness, mold growth, dark and depressing interiors, and rodent and pest problems.

The case for new staff housing for approximately 30 staff is clear: improved housing conditions will attract and keep higher-caliber staff. Retaining quality staff is directly tied to the strength and quality of the program. Without consistent, high-quality staff, there is no program, and without a program, there are no kids. More explicitly, the quality of staff we are able to attract and keep directly affects the experience kids have at camp. Not only will improved housing result in better staff, but better

staff will translate into reduced liability, fewer personnel problems, more staff energy directed to providing a quality program to more kids, and more staff energy to market the programs and facilities to potential users which in turn generates more revenue for program and facility. With staff wages hovering near poverty level, providing safe and modest room and board raises staff compensation to a level that is acceptable.

**Relocation of Outdoor Chapel**

Another cost built in to the plans for the old side of camp is the relocation of the outdoor chapel which is intended to resolve complaints from local neighbors that noise from the Sunday liturgical celebrations is a disturbance. Relocation of the chapel (estimated to cost $70,000) may likely become a strategic consideration as a community peace offering as we try to move forward in the entitlement process and are faced with local opposition at the county level with the noise issue at the heart of the debate. The elimination of the Stepping Stone living unit, the redesign of the camp entrance (mentioned earlier), and the reduced number of youth on the property should ease neighborhood tensions around the issues of noise and impact on the surrounding community. Pursuing an easement agreement for the property would be yet another harmony-producing note to strike with the neighbors.

**Infrastructure**

Lastly, the scope of work includes an overhaul of existing infrastructure, including water, septic, and electrical systems at a cost of $450,000. The present infrastructure is 30-60 years old. These systems typically have a 40-year lifespan. Poorly functioning infrastructure ties into the safety and health hazards mentioned earlier, including water quality, proper sewage containment and processing, and electrical integrity. The replacement of existing infrastructure is the highest priority of all of the capital needs enumerated here. Without it, we would be unable to support a built environment to safely house clients and staff and soundly operate our programs.

2004 REPORT TO FUNDERS 4

**CYO Camp**
Generous proceeds from CYO Golf Day, combined with solid annual support from The Guardsmen and a handful of loyal foundations make it possible for low-income, inner-city kids to attend CYO Camp each year. Last summer, this outstanding support provided camperships to a total of 647 financially needy campers. This figure represents 41% (647 out of 1,556 total campers) who received some form of financial assistance thanks to CYO Golf Day, The Guardsmen, and our foundation friends.

Because of this generosity, hundreds of youth had the opportunity to experience an unforgettable summer camp where youth ages 7 to 18 from vastly different life experiences succeeded in coming together to share important, formative life experiences with each other. Their summer camp experience allowed them to learn and grow from belonging to a community of campers where respect for each other's differences and similarities was tantamount. In five 10-day sessions, campers had the opportunity to discover special qualities in themselves, in others, and in the natural world around them. Together, campers and staff built a community of care and friendship and created bonds and memories that will leave a lasting, positive impression. In preparation for this summer, Camp staff have already identified campers by reaching out to social service agencies, community-based organizations, Catholic schools and parishes, public school districts, attendees of CYO Caritas Creek, and past attendees of CYO Camp. The criteria we use to screen campers for campership eligibility are the USDA-stipulated poverty guidelines listed on our application. For special circumstance situations, families document those circumstances with explanations in writing and supporting documentation.

**Caritas Creek Environmental Education**
During the current school year, CYO Camp's year-round staff bridged the time between the close of last summer and the exciting summer camp sessions coming up in 2004 with contact and mentorship. Many of the young people who attended CYO Camp also attended Caritas Creek this school year, which has provided a seamless source of contact and support from one summer to the next.

During the 2003-2004 school year, we served a total of 3,340 5th-8th grade students, including 386 students from several low- and middle-income schools. Caritas Creek was successful in serving a broad range of school communities in the Catholic school network with special outreach to underserved public school groups from impacted urban communities. Like CYO Camp, we accomplished our goal of bringing students from different socio-economic backgrounds together to participate during 24 individual program weeks. Our special outreach to low-income school communities is an important, and growing, dimension of Caritas Creek's commitment to serving a broad range of school groups.

**Capital Campaign to Renovate CYO Camp**
We are nearing completion of the third and final phase in the capital campaign to rebuild the Coyote side of CYO Camp. In the fourth cabin community (being built *before* the third community), Cabins 23 and 24 were completed in June 2002, followed by the completion of Cabins 21 and 22 and Cabins 19 and 20 in August 2003. We are excited to report that the fourth cabin community is now completely finished. This means that we have only the third cabin community left to build in Phase III. Construction progress for this community is as follows: *Cabins 13 and 14*: demolition of 2-3 old cabins presently on this site has begun to

clear the way for this new pair; *Cabins 15 and 16*: construction of this pair is 75% complete; *Cabins 17 and 18*: the foundation is complete and framing is underway. In addition, the lower bathhouse will be built as a part of the third community. We estimate another six months to complete the third cabin community, including the bathhouse.

In January 2004, the Board of Directors of Catholic Charities CYO decided to earmark $511,000 from a recent bequest to be used to complete the third cabin community. We know that the remaining cabin pairs will cost $135,000 each, and the lower bathhouse will cost $250,000.

The Marion Deering McCormick Foundation contributed $20,000 to the construction of Phase III cabin communities in December 2003. We also received a contribution from Lakeside Foundation in November 2003 in the amount of $5,000. In December 2003, Catholic Charities CYO directed a matured certificate of deposit in the amount of $104,000 to the cabin communities in Phase III. These three sums, along with the $511,000 bequest, give us $640,000 in capital toward the $655,000 we will need to finish the third community.

In addition to the balance of $15,000 we must secure to finish this third and final community, these figures do not include one remaining Master Plan project we must address in Phase III, which is the renovation of the downstairs portion of the Main Lodge. For this we will need at minimum an additional $140,000. This work will include completing the seismic retrofitting and remodeling the bathrooms (the galvanized pipe is failing due to electrolysis, among other serious problems). If we can raise another $110,000 (for a total budget of $250,000 to renovate the downstairs portion of the Lodge) we will also remodel the dorm rooms to make them suitable as multi-use space. However, the priority is the seismic work and bathroom remodel.

Our attention and available resources are focused on bringing the construction of the third and final cabin community to conclusion in the next year. In the meantime, we will need to fundraise the last $15,000 needed to build this community, as well as the funds needed to finish the Main Lodge and the Master Plan to renovate CYO Camp in its entirety.

**CYO Camp: New Directions**

In much the same way as we have finally realized our long-held goal of maintaining a year-round staff for both CYO Camp and CYO Caritas Creek, we have begun to actualize another longstanding goal. We are beginning to interface our outdoor environmental education curriculum and concepts of environmental stewardship during summer camp with the inherent educational value of the surrounding built environment. Three examples of this are: a) progress we've made to develop plans and obtain funding to renovate two non-contiguous stretches of Salmon Creek on the property and infuse the creek restoration project into the existing environmental education curriculum and summer camp elective structure; b) "First Impressions" work weekend devoted to regrading, landscaping and general "sprucing up" of the entrance to the property to improve the initial impact on visitors to the site; and c) early-stage discussions regarding renovating the old side of CYO Camp (Miwok Camp). This <u>second</u> half of the larger capital campaign now nearing completion on the new side (Coyote Camp) would include a community-supported redesign and rebuild of Coyote Camp that has values of environmental stewardship at its core and which can be folded into the curricula for both summer camp and Caritas Creek. All of

these activities include a strong component of hands-on work projects for youth served through the year-round programs as a new dimension of our philosophy and impact upon the youth we serve.